PARKER, Justice.
*235 Conecuh Timber, Inc., Ayres Forestry, Inc., BAR Forest Products, LLC, Dry Creek Loggers, Inc., Pea River Timber Company, Inc., Pineville Timber Co., LLC, and THE Timber Company, LLC (sometimes referred to as "TTC") (hereinafter collectively referred to as "the wood dealers"), sued Alabama River Group, Inc. ("ARG"), and ARG's chairman and chief executive officer George Landegger (hereinafter collectively referred to as "the ARG defendants"[1] ) in the Monroe Circuit Court, asserting various claims arising from transactions between the wood dealers and ARG's predecessors; the transactions were affected by a short-lived subsidy program administered by the United States Department of Agriculture's Farm Service Agency ("the FSA") known as the Biomass Crop Assistance Program ("BCAP").[2] Following a jury trial, a judgment was entered against the ARG defendants awarding the wood dealers $1,092,692.71 in compensatory damages and $7,000,000 in punitive damages. The trial court reduced the punitive-damages award by virtue of the statutory cap in § 6-11-21, Ala. Code 1975, resulting in a total judgment of $6,395,489.37. The ARG defendants filed posttrial motions, which, after a hearing, the trial court denied. The ARG defendants appeal.
I. Facts and Procedural History
As part of the Food, Conservation, and Energy Act of 2008, also known as the 2008 Farm Bill, the United States Congress created BCAP to help stimulate the development of renewable "bioenergy" sources and to assist agricultural- and forest-land owners and operators with the use of eligible material in a "biomass conversion facility" ("BCF").[3] As one element of BCAP, a wood dealer delivering eligible biomass materials to a qualified BCF was eligible to receive a subsidy from the FSA if the biomass material was subsequently used for generating energy. The FSA first announced details of BCAP in the summer of 2009.
*236 On October 28, 2009, the FSA published a notice outlining what biomass materials were eligible for a BCAP subsidy ("the BCAP materials list"). As concerns this case, the BCAP materials list authorized the payment of a subsidy for eligible timber products such as tree branches, treetops, wood chips, and bark; however, the BCAP materials list specifically enumerated materials that were not eligible for a BCAP subsidy, including what is known in the timber and paper-making industries as "black liquor."[4]
On October 29, 2009, the day after the FSA released the BCAP materials list, the United States Department of Agriculture ("the USDA") discussed BCAP in a telephone conference call with representatives of the timber and paper-making industries, including Landegger. During the call, an FSA official responded to a written question about black liquor by stating that "black liquor is not going to be eligible" for the BCAP subsidy and that, "[i]f a wood residue or pulp material is brought to a pulp mill, the component of that would be turned into black liquor and would not be an eligible material." Landegger asked why black liquor was ineligible, stating he was "not sure what the rationale was for removing black liquor as an eligible material or pulp as a byproduct." The official responded that all the details of BCAP were still being worked out in the regulatory process and that there could be substantial changes in the forthcoming rules.
Although BCAP did not provide any direct benefits to pulp-mill owners, Landegger decided to participate in the program by obtaining certification for two pulp mills operated by Landegger's companies in Monroe County, Alabama (the two companies eventually became ARG).[5] The ARG mills were thereafter certified by the FSA as qualified BCFs under BCAP. To qualify as a BCF, the ARG pulp mills entered into an agreement with the USDA to follow the rules and regulations governing BCAP and to certify for BCAP subsidies only eligible materials listed on the BCAP materials list. ARG thereafter advertised its BCF status and promoted BCAP to wood dealers throughout its area of operation, explaining to them that they could receive BCAP subsidies for eligible wood products delivered to the ARG pulp mills.
*237 ARG also explained to those wood dealers, however, that it would pay a reduced, below market price for wood products delivered to ARG mills that were eligible for BCAP subsidies, with the expectation that the BCAP subsidies would make up for that discount and provide an additional profit for wood dealers as well. ARG further represented that, if the BCAP subsidies were not paid to wood dealers or were lower than expected, it would pay the "difference" and make wood dealers "whole." The parties dispute, however, whether the "difference" ARG agreed to pay was the difference between the below market price ARG paid and the actual market price in effect at that time or the difference between the below market price ARG paid and the net price the wood dealers expected to get after the advertised BCAP subsidies were paid.
As an example of ARG's BCAP-related transactions with the wood dealers, one of those dealers-Ayres Forestry-was receiving $39 per ton for wood products delivered to the ARG pulp mills before the start of BCAP. An ARG representative explained that Ayres Forestry would receive only $31 per ton from ARG for delivering wood products on the BCAP materials list, but it would also receive a BCAP subsidy of $12.12 per ton from the FSA, thus resulting in a net gain of $4.12 per ton for Ayres Forestry (and an $8 savings per ton for ARG). To receive the BCAP subsidy, Ayres Forestry had to submit to the local FSA office a form, copies of the sales contracts, and sales receipts signed by the ARG mills in their capacity as a BCAP-qualified BCF and reflecting the amount of eligible material delivered. ARG, as a BCF, was required to measure moisture content and tonnage and other relevant qualities of the wood delivered and to certify how much of the wood was eligible under BCAP. ARG required Ayres Forestry and the other wood dealers to use a system by which drivers delivering "BCAP wood" to ARG had to use a card of a particular color.
ARG concluded that there was some ambiguity in the interpretation of the BCAP materials list, specifically whether it barred the payment of a BCAP subsidy for the delivery of only processed black liquor but not materials converted into black liquor. The FSA had stated its intent in the above-referenced conference call that it would not approve wood used for black liquor. Moreover, ARG's chief financial officer and Landegger's son-in-law, Arick Rynearson, sent an e-mail to Landegger warning that "USDA has made their intent clear-they want to exclude black liquor." "We can push it," Rynearson wrote, "but I suspect that in the end, we will end up only having our bark and forest residue qualify." Nevertheless, ARG, with approval from Landegger, made the decision to certify as eligible materials for BCAP subsidies those wood materials that would ultimately be converted into black liquor.
This decision allowed ARG to calculate approximately 50-55% of a tree as eligible under the BCAP materials list, rather than approximately 10-12% of a tree that otherwise would be eligible, thus resulting in higher subsidy payments for the wood dealers and, presumably, more profit for all the parties. In early December 2009, ARG processed an initial "test" load delivered by a wood dealer (not one of the plaintiffs) pursuant to this interpretation of the BCAP materials list. ARG provided the wood dealer with a delivery ticket stating that 54% of the "bone dry tons" of the wood delivered to ARG qualified for the BCAP subsidy. The FSA state office paid the full subsidy on that 54% certification. On December 21, 2009, ARG began processing timber products in this same manner for approximately 50 different wood dealers who agreed to haul wood to ARG.
*238 The wood dealers testified at trial that they were ignorant of the fact that ARG was including in its calculation of eligible materials wood products ARG used in the production of black liquor.
On January 21, 2010, after someone apparently complained to the FSA about ARG, the FSA suspended ARG from participating in BCAP and halted relevant BCAP subsidies to wood dealers who hauled to ARG, explaining in an e-mail sent to county FSA offices that "there may be possible discrepancies in the methods used by [ARG] to determine the percentage of product that is being used for biomass." ARG thereafter learned that the suspension was caused by its decision to certify for a BCAP subsidy material that was being converted to black liquor. ARG immediately began working to get the suspension lifted, and ARG officials, including Landegger, subsequently met with FSA officials in Washington, D.C., to explain their interpretation of the BCAP materials list and to attempt to resolve the dispute and ARG's suspension.
While it worked to reverse the suspension, ARG told the wood dealers that the suspension was just the result of a misunderstanding and encouraged them to continue to deliver their products to the ARG pulp mills, even though the suspension meant no BCAP subsidies would be paid for wood delivered to ARG. For instance, wood dealer John Ayres of Ayres Forestry testified that, after ARG was suspended, Mark Bond of ARG told Ayres: "We are not really kicked out. Everything was legal. We got the formula approved by the FSA. Just a misunderstanding. We are going to get put back in the program." Accordingly, in order ostensibly to "help" the wood dealers with their decreased cash flow after ARG's suspension from BCAP, ARG agreed to "advance" the wood dealers the difference between the lower, below market rate ARG was paying and the market rate for all deliveries made during the suspension. ARG drafted promissory notes for those advances and required the wood dealers to sign them in order to receive the advance payments. ARG claimed at trial that it did not intend to demand payment on the notes if the BCAP subsidies were not paid to the wood dealers.
On February 8, 2010, the FSA published for public comment its proposed rules governing BCAP. The proposed rules explicitly provided that black liquor was "not an eligible material" and that BCAP subsidies would not be paid for "[e]ligible material delivered to a qualified [BCF] used to produce black liquor." The proposed rules were to become final in October 2010.
On February 24, 2010, the deputy administrator for farm programs of the FSA revoked ARG's status as a qualified BCF and tentatively found (1) that ARG had engaged in a scheme or artifice to present false information to the FSA in connection with BCAP and (2) that ARG was liable for the amount of BCAP subsidies that had been improperly paid to wood dealers based on ARG's certification as eligible for a BCAP subsidy materials that were delivered to ARG and converted into black liquor. ARG appealed the FSA's decision. While ARG's appeal was pending, many wood dealers continued to deliver wood products to ARG and to file requests for BCAP subsidies with the FSA, continuing to do so through April 2010-when BCAP ended for the fiscal year-with the hope that the FSA would reconsider its decision to terminate ARG's involvement in BCAP. On March 1, 2010, ARG once again began paying wood dealers full market price for delivered materials.
In November 2010, Landegger, on behalf of ARG, formally entered into a settlement with the FSA resolving the dispute *239 over BCAP subsidies that had been improperly paid to wood dealers based on ARG's certification as eligible for a BCAP subsidy materials that ARG turned into black liquor and settling all outstanding requests for BCAP subsidies made by wood dealers for materials delivered to ARG after ARG's suspension on January 21. Pursuant to this settlement, the FSA agreed to withdraw its previous finding that ARG had engaged in a scheme to submit false information to the FSA and to reverse ARG's January 21 suspension and February 24 termination from BCAP as a qualified BCF. The FSA and ARG also agreed that the amount of the BCAP subsidy for all deliveries before January 21 would be recalculated to exclude payments for materials converted to black liquor and that this same formula would be used to calculate the subsidies wood dealers were entitled to for products delivered after January 21. ARG agreed to set up an account of $2.4 million from which payments would be made to the FSA and then to wood dealers who did not receive BCAP subsidies for wood delivered to ARG because of the suspension. The outstanding BCAP subsidies for wood products delivered after January 21, however, would be subtracted from overpayments made before January 21, and the FSA agreed to make additional BCAP subsidy payments to any given wood dealer only to the extent the amount owed exceeded the amount of previous overpayment. If a wood dealer still had an overpayment thereafter, ARG agreed to reimburse the FSA for that amount.
On October 6, 2010, before ARG entered into its settlement with the FSA, the wood dealers sued ARG, Landegger, and Steve Harris-the president of an ARG affiliate involved in the operation of ARG's pulp mills-in the Monroe Circuit Court, asserting breach-of-contract, negligence, wantonness, and multiple fraud claims. The wood dealers alleged fraudulent misrepresentation against all defendants but alleged breach of contract against only "[ARG] and/or fictitious defendants A-L," excluding Landegger and Harris. The gravamen of the wood dealers' complaint was that ARG had made various misrepresentations to them related to its participation in BCAP in order to induce them to sell wood products to ARG at a reduced price and that they had suffered economic damage as a result.
ARG, Harris, and Landegger filed an answer denying the allegations, and ARG asserted counterclaims against all the wood dealers except Pineville Timber Co. and THE Timber Company based on the promissory notes those entities had executed for funds ARG advanced them during the time the FSA was not paying BCAP subsidies for timber products delivered to ARG. The wood dealers denied those counterclaims. The wood dealers amended their complaint and added additional plaintiffs, and ARG filed amended counterclaims against six of the wood dealers.
A lengthy pretrial process ensued, during which the ARG defendants broadly allege that the trial court failed to properly manage the case. See, e.g., the ARG defendants' brief, at pp. 2-5. By agreement of the parties, a trial date was finally set for August 24, 2015. On May 26, 2015, approximately one month after that trial date had been set, a New York federal district court sentenced Landegger to two months in federal prison followed by six months of home confinement in Connecticut for an unrelated criminal matter.[6] Landegger began serving his sentence on June 24, 2015, *240 and, on June 26, 2015, the ARG defendants and Harris moved the trial court to continue the trial until at least February 2016 so that Landegger could attend and participate. The trial court denied the motion.
The trial began on August 24, 2015. During the course of the trial, the wood dealers dropped their deceit, negligence, and wantonness claims. The trial court ultimately charged the jury only on the wood dealers' misrepresentation and breach-of-contract claims, as well as ARG's counterclaims based on the promissory notes executed by some of the wood dealers. As to the breach-of-contract claim, the trial court gave charges on both express and implied contracts, over the objection of the ARG defendants to the implied-contract charge. As to the wood dealers' misrepresentation charge, the ARG defendants sought, over the objection of the wood dealers, an instruction on promissory fraud. The trial court declined to give the promissory-fraud instruction. The trial court instructed the jury with respect to the verdict form as follows:
"There are three defendants. And you can find against one or all three, defendant Alabama River Group, Inc., defendant Steven Harris, and defendant George Landegger.
"And these are compensatory damages, which would be returned under-if you find the plaintiffs, they had a contract and it was breached by the defendants, or if you find that the defendants committed fraud."
On August 31, 2015, the jury returned a general verdict in favor of the wood dealers and against ARG and Landegger for $8,092,692.71-a combined total of $1,092,692.71 in compensatory damages and $7,000,000 in punitive damages. The jury found Harris not liable on all claims against him. The jury also ruled against ARG on its counterclaims. On September 3, 2015, the trial court entered a judgment consistent with the jury's verdict. However, in accordance with the statutory cap on punitive damages set forth in § 6-11-21, Ala. Code 1975, the trial court subsequently reduced the punitive damages awarded, resulting in a total judgment of $6,395,489.37.
On October 5, 2015, the ARG defendants filed postjudgment motions, including a motion for a judgment as a matter of law, a motion for a new trial, and a motion for remittitur of the compensatory and punitive damages. After a December 3, 2015, Hammond / Green Oil [7] hearing, the trial court denied all motions. ARG and Landegger appealed.
II. Standards of Review
"This Court reviews de novo the grant or denial of a motion for a [judgment as a matter of law], determining whether there was substantial evidence, when viewed in the light most favorable to the nonmoving party, to produce a factual conflict warranting jury consideration. Alfa Life Ins. Corp. v. Jackson, 906 So.2d 143, 149 (Ala. 2005) (citing Ex parte Helms, 873 So.2d 1139, 1143-44 (Ala. 2003) ). ' " '[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' " ' Dolgencorp, Inc. v. Hall, 890 So.2d 98, 100 (Ala. 2003) (quoting Wal-Mart Stores, Inc. v. Smitherman, 872 So.2d 833, 837 (Ala. 2003), quoting in turn *241 West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989) )."
Jones Food Co. v. Shipman, 981 So.2d 355, 360-61 (Ala. 2006).
In reviewing a trial court's rulings on jury instructions, a motion for new trial, a motion for a continuance, and exclusion of evidence, this Court considers whether the trial court exceeded its discretion. Wood v. Hayes, 104 So.3d 863, 870 (Ala. 2012) ; Arthur v. Bolen, 41 So.3d 745, 749 (Ala. 2010) ; Wright Therapy Equip., LLC v. Blue Cross & Blue Shield of Alabama, 991 So.2d 701, 705-706 (Ala. 2008) ; Kult v. Kelly, 987 So.2d 551, 555 (Ala. 2007) ; and Davis v. Hanson Aggregates Southeast, Inc., 952 So.2d 330, 334 (Ala. 2006). Generally, " 'a jury verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of a motion for a new trial.' " Line v. Ventura, 38 So.3d 1, 8 (Ala. 2009) (quoting Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31 (Ala. 1999) ). We " 'must consider the evidence in the light most favorable to the prevailing party, and ... will set aside the verdict only if it is plainly and palpably wrong.' " Id.
In reviewing damages, this Court reviews an award of punitive damages de novo and with no presumption of correctness to "ensure that all punitive damage awards comply with applicable procedural, evidentiary, and constitutional requirements, and to order remittitur where appropriate." § 6-11-21(i), Ala. Code 1975. See also §§ 6-11-23(a) and 6-11-24(a), Ala. Code 1975; Schaeffer v. Poellnitz, 154 So.3d 979, 986 (Ala. 2014). We review an award of compensatory damages, however, to consider whether the jury exceeded its discretion, "viewing the evidence from the plaintiff's perspective." First Commercial Bank v. Spivey, 694 So.2d 1316, 1326 (Ala. 1997). In the absence of a "flawed" verdict-which this Court has defined as a verdict influenced by " 'misconduct, bias, passion, prejudice, corruption, improper motive, or cause not consistent with the truth and the facts' "-we have " 'no statutory authority to invade the province of the jury in awarding compensatory damages.' " Hornady Truck Line, Inc. v. Meadows, 847 So.2d 908, 922 (Ala. 2002) (quoting Pitt v. Century II, Inc., 631 So.2d 235, 240 (Ala. 1993) ).
III. Discussion
On appeal, ARG and Landegger argue that they were entitled to a judgment as a matter of law on some of the wood dealers' claims or, in the alternative, that they are entitled to a new trial based on errors they allege the trial court committed (1) in charging the jury, (2) in denying their request for a continuance so Landegger could attend the trial, and (3) in excluding certain evidence at trial. ARG and Landegger also argue, alternatively, that this Court should further remit both the compensatory and punitive damages awarded the wood dealers.
A. Misrepresentation Claims Against ARG
The ARG defendants first argue that the trial court erred in denying their motions for a judgment as a matter of law ("JML") because, they say, the wood dealers failed to produce at trial substantial evidence of a misrepresentation of existing material fact. Specifically, the ARG defendants make the following arguments: (1) that the evidence at trial showed merely that the alleged misrepresentations made to the wood dealers were either actually true or not material and (2) that the alleged misrepresentations concerned acts or events to occur in the future, sounding in promissory fraud rather than misrepresentation.
By statute, misrepresentation claims are a type of legal fraud: namely, "[m]isrepresenta *242 tions of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party." § 6-5-101, Ala. Code 1975. This Court has articulated the elements of a misrepresentation claim as follows:
"1) [A] misrepresentation of material fact, 2) made willfully to deceive, recklessly, without knowledge, or mistakenly, 3) which was reasonably relied on by the plaintiff under the circumstances, and 4) which caused damage as a proximate consequence. See Foremost Ins. Co. v. Parham, 693 So.2d 409, 421-22 (Ala. 1997) (citing § 6-5-101, Ala. Code 1975, and Harrington v. Johnson-Rast & Hays Co., 577 So.2d 437 (Ala. 1991) )."
Bryant Bank v. Talmage Kirkland & Co., 155 So.3d 231, 238 (Ala. 2014).
On appeal, the parties do not dispute the sufficiency of the evidence as to all the elements of misrepresentation. No arguments are presented concerning the degree of falsity (second element), reasonable reliance (third element), or causation (fourth element). The ARG defendants focus on the first element of misrepresentation; they argue that the wood dealers offered no evidence of a misrepresentation of material existing fact. Any alleged misrepresentation made by the ARG defendants, they argue, was either true, not material, or mere opinion. Specifically, the ARG defendants point to the alleged representations by the ARG defendants (1) that ARG "had become properly qualified facilities for BCAP," which the ARG defendants claim was a true statement; (2) that the wood dealers' wood materials were eligible for BCAP subsidies, which the ARG defendants claim was also a true statement; and (3) that ARG's suspension from BCAP was "just a misunderstanding," which the ARG defendants claim was merely a statement of opinion or prediction. Thus, argue the ARG defendants, there was no, or at least not substantial, evidence in the trial court to support a misrepresentation claim.
The wood dealers respond that the trial court had before it substantial evidence of several false and material representations and that, on appeal, the ARG defendants selectively take out of context certain statements in the record to support their arguments. The wood dealers do not dispute that ARG's mills were, at least initially, qualified BCFs; in fact, the amended complaint expressly alleged that the ARG defendants applied to the FSA and were "approved to be a qualified energy conversion facility." Rather, the wood dealers alleged that the qualification of ARG's mills as BCFs was a threshold representation upon which the rest of the misrepresentations made to the wood dealers largely depended. As the amended complaint alleged:
"In 2009, [the ARG] [d]efendants approached [the wood dealers] regarding the purchase of eligible materials for BCAP. [The ARG] [d]efendants represented that APP [Alabama Pine Pulp Company, Inc.] and ARP [Alabama River Pulp Company, Inc.] had become properly qualified facilities for BCAP. [The ARG] [d]efendants also stated that in order to sell wood to [ARG], [the wood dealers] would be required to reduce the price of their wood below market rates. In exchange for the reduction in price, [the ARG] [d]efendants ensured that [the wood dealers] would receive the BCAP matching payments, which, according to [the ARG] [d]efendants, would be well over the required reduction in price, and would result in higher profit for [the wood dealers]. [The ARG] [d]efendants also represented that [the wood dealers] would be paid the *243 amounts agreed upon, including the amount due under BCAP, even if [the wood dealers] did not receive their BCAP matching payment."
Seen in context, the ARG defendants' representation about its mills' BCAP qualification was never alleged to be a false statement in itself, but it was alleged to be a material predicate for the alleged misrepresentations that followed. In the words of the trial court, "[b]y becoming qualified in [BCAP], [the] ARG [defendants] aimed to take advantage of federal matching payments for eligible materials delivered to ARG by wood dealers and used by ARG to make energy." Therefore, although we agree with the ARG defendants that their representation that the ARG mills were each a "qualified facility for BCAP" was, standing alone, a true statement, we agree with the wood dealers that it was also material to the series of misrepresentations allegedly made to the wood dealers about BCAP and the parties' respective roles in it.
In response to the ARG defendants' next argument-that the representation that the wood dealers' products delivered to ARG were eligible for BCAP subsidies was true-the wood dealers respond that the statement was only partially true: although a portion of the wood delivered was eligible for a BCAP subsidy, wood that was converted to black liquor was not. The evidence submitted below indicates that the FSA did not consider wood converted to black liquor to be an eligible material under the BCAP materials list, that black liquor was expressly listed as an in eligible material on the BCAP materials list, and that ARG and Landegger knew the FSA's position on black liquor and material converted to black liquor. Nevertheless, unbeknownst to the wood dealers, ARG included wood material used to make black liquor in its BCAP subsidy calculations and then expressly used this larger subsidy "formula" to induce the wood dealers to deliver their wood to ARG's mills instead of its competitors' mills. For example, John Ayres of Ayres Forestry testified that ARG told him "that [ARG] had a formula that was better than the other mills and that if I hauled wood to them, that I would get paid about two more dollars a ton than if I hauled wood" elsewhere. When asked if ARG mentioned "that they put black liquor in the formula" or if he otherwise knew that, Ayres responded: "No." Wade Rolison of BAR Forest Products testified that, when ARG explained that, under BCAP, BAR's sale price would be lowered $8 per ton, Rolison was assured that ARG "had gotten approved," showed them the ticket from the "test run" by another wood dealer, and told Rolison he would receive about $4 more per ton under BCAP if they sold to ARG. Malcolm Smith of Conecuh Timber was asked on cross-examination whether he understood that the reason ARG was "claiming a higher percentage of the wood as eligible" for a BCAP subsidy was because of the inclusion of material used to make black liquor. Smith responded: "None of that was ever mentioned in our meeting, nothing about black liquor.... [ARG] told me that that was their formula for the BCAP.... I didn't know anything about a formula." Mackey Bruce of Pea River was asked whether he knew anything about "the formula that [ARG] was giving" him to support the prices it quoted him. Bruce replied: "Absolutely not." He was asked whether ARG told him "they were running this risk trying to include black liquor in that." Bruce stated: "I had no idea." When Tommy Mosley of Pineville Timber expressed doubts that he would get a higher price after the BCAP subsidy was paid, ARG assured him that " '[i]t works' " and stated that ARG had "sent a test load through"
*244 and " '[t]hey paid it. Everything is fine.' " David Wright of THE Timber Company was induced to sell to ARG at its reduced price for BCAP because of ARG's assurance that, after the BCAP subsidy, "it was more money than the other mills the way they were doing their formula. They were the experts, you know. And so I was not the expert." The evidence at trial demonstrated that ARG represented to the wood dealers that they would receive a higher BCAP subsidy by selling to ARG, even though ARG's proprietary "formula" included a substantial amount of material that was ineligible for a BCAP subsidy.
ARG's representations to the wood dealers that they would receive a BCAP subsidy, even if true for part of the wood products at issue, was not true as to material used to make black liquor. It is no defense that the statements ARG made were, at best, "half-true."
" ' "To tell half a truth has been declared to be equivalent to the concealment of the other half. A partial and fragmentary disclosure, accompanied by the willful concealment of material and qualifying facts is not a true statement, and is as much a fraud as an actual misrepresentation, which, in effect, it is." ' "
Jackson Co. v. Faulkner, 55 Ala.App. 354, 364, 315 So.2d 591, 600 (1975) (quoting American Bonding Co. of Baltimore v. Fourth Nat'l Bank, 206 Ala. 639, 641, 91 So. 480, 482-483 (1921), quoting in turn 12 Ruling Case Law §§ 70-71)). See also Restatement (Second) of Torts § 529 (1977) ("A statement containing a half-truth may be as misleading as a statement wholly false."). The record is replete with examples of ARG misrepresenting how much of the wood dealers' wood material was eligible for BCAP subsidies, and therefore misrepresenting the total price the wood dealers would receive. ARG's formula for calculating BCAP subsidies based upon material used to make black liquor was material and, indeed, necessary to its efforts to induce the wood dealers to sell to ARG at a reduced price. We disagree, therefore, with the ARG defendants and hold that there was substantial evidence below from which to conclude that ARG's statements regarding whether the wood dealers' products were eligible for the BCAP subsidy were misleading, false, and material.
Next, the parties dispute whether ARG's repeated characterization of its suspension from BCAP as "just a misunderstanding" was actionable as misrepresentation or was merely opinion or prediction. The ARG defendants argue that the suspension was a misunderstanding with the FSA and that describing it as such was merely a statement of ARG's opinion or a prediction that the FSA would eventually agree with ARG's position. For support, the ARG defendants cite Crowne Investments, Inc. v. Bryant, 638 So.2d 873, 877 (Ala. 1994), in which this Court held that "mere statement of opinion or prediction as to events to occur in the future" will not support a fraud claim, absent proof of an intent to deceive. In Crowne, this Court held that an insurance agent's statement, " 'I think we found an answer to our problem in insuring' " his client, Mickey Kennedy, was not a statement of existing fact but rather "a statement of opinion" or, at most, "the expression of a belief that the company with which Kennedy applied, Inter-American Insurance Company, would issue Kennedy insurance in the future." Id. at 876, 877.
In the present case, however, there was sufficient evidence from which to conclude that the ARG defendants' statements were not merely an opinion or a prediction about events to occur in the future. For instance, Mark Bond of ARG assured Ayres Forestry after ARG was suspended *245 from BCAP that "[w]e are not really kicked out. Everything was legal. We got the formula approved by the FSA. Just a misunderstanding. We are going to get put back in the program." These statements described not future events but past actions by the FSA and the current status of ARG: that the FSA had approved ARG's "formula" for eligible materials and that ARG mills were not "really kicked out" of BCAP. In Crowne, this Court found it significant in determining whether the insurance agent's statement was mere opinion that he said he "thought" he had found life-insurance coverage for his client. By contrast, ARG's alleged statements about its BCAP suspension and status were categorical, with no qualifying words of opinion such as "we think" or the like. We conclude, therefore, that there was sufficient evidence introduced from which to conclude that the ARG defendants' statements about ARG's suspension from BCAP were statements of material fact and not merely opinion or a prediction about future events. The ARG defendants' first argument that their statements were true or immaterial is unconvincing.
The ARG defendants' next argument is that the trial court erred in denying their motion for a JML because, they say, the alleged misrepresentations concerned acts or events to occur in the future, sounding in promissory fraud rather than misrepresentation. Promissory fraud, unlike misrepresentation, is a claim "based upon a promise to act or not to act in the future." Ex parte Moulton, 116 So.3d 1119, 1144 (Ala. 2013) (citations and quotation marks omitted). To succeed on a claim of promissory fraud, the ARG defendants note, plaintiffs must prove two elements in addition to the elements of misrepresentation, namely: "proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and ... proof that the defendant had an intent to deceive." Id. (citations and quotation marks omitted); Benetton Servs. Corp. v. Benedot, Inc., 551 So.2d 295, 298 (Ala. 1989) ; Southland Bank v. A & A Drywall Supply Co., 21 So.3d 1196, 1210-12 (Ala. 2008).
The ARG defendants argue that the complaint alleged promissory fraud instead of misrepresentation, that the wood dealers emphasized promissory fraud in their opening statements and in trial testimony, and that the wood dealers then "waived" their promissory-fraud claim by withdrawing their claim alleging deceit and by objecting to the ARG defendants' requested jury instruction on promissory fraud. For example, the ARG defendants focus on the representations alleged in the complaint that the wood dealers "would receive" the BCAP subsidies from the FSA; that those subsidies "would be" more than the reduction in price, which "would result" in higher profits for the wood dealers; and that, after ARG was suspended from BCAP, the ARG defendants "would pay" the matching BCAP subsidies even if the FSA did not. The ARG defendants point to similar statements by the wood dealers' attorneys in opening statements and by representatives of the wood dealers who testified at trial.
The representations at issue here, argue the ARG defendants, are like the promises made by the bank in Southland Bank that the bank "would extend a loan" to the plaintiffs. Southland Bank, 21 So.3d at 1211. This Court in Southland Bank held that "a representation to lend money in the future is a promise to perform a future act" and not "a representation of an existing fact." Id. In fact, we noted in Southland Bank that "[t]he allegations in the complaint and the testimony at trial all contemplate representations of future performance on the part of the defendants."
*246 21 So.3d at 1210 (emphasis added). Similarly, argue the ARG defendants, their alleged misrepresentations all relate to promises to perform a future act.
The wood dealers respond that their misrepresentation claim is one of fraud in the inducement, not promissory fraud. " ' "Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." ' " Farmers Ins. Exch. v. Morris, 228 So.3d 971, 978 (Ala. 2016) (quoting Johnson Mobile Homes of Alabama, Inc. v. Hathcock, 855 So.2d 1064, 1067 (Ala. 2003), quoting in turn Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454, 459 (Ala. 2000) ). The wood dealers argue that promises of how much money someone would receive in the future based on the present state of facts sound in misrepresentation. They cite, among other cases, Standard Furniture Manufacturing Co. v. Reed, 572 So.2d 389 (Ala. 1990), in which the employer Standard Furniture argued that its representations to an employee, James Reed, about the amount of lump-sum retirement money Reed would receive if he retired sounded in promissory fraud. This Court disagreed, stating: "The agents of Standard Furniture represented a present fact: the amount Reed would receive in the future based upon the present state of the pension fund." 572 So.2d at 392. Therefore, this Court in Standard Furniture held that Reed "needed only to prove that the facts represented were false and that they were either intentionally or recklessly misrepresented." Id.
The wood dealers also direct us to International Resorts, Inc. v. Lambert, 350 So.2d 391 (Ala. 1977). In International Resorts, this Court upheld a judgment on a fraud claim against real-estate developers where plaintiffs Wesley Lambert and his wife signed an installment-sales contract with defendants for a particular parcel of real estate designated and marked off as lot "S-4" but were later "reassigned" a different real-estate lot. Id. at 392. We held that there was sufficient evidence in the record "from which the jury could have concluded that the defendants represented to the plaintiffs that they were buying a particular piece of real property which the plaintiffs inspected and which was represented to them to be for sale at a particular price." 350 So.2d at 394. Similarly, the wood dealers argue, the ARG defendants represented to the wood dealers what they "would receive" based on an existing set of facts: that ARG's mills were qualified BCFs and that wood materials the wood dealers hauled to them would be eligible for BCAP subsidies because, in part, their "formula" had been "approved."
Even if, as the ARG defendants argue, there was also evidence in the record below that sounded in promissory fraud, a claim of misrepresentation is not necessarily mutually exclusive with a promissory-fraud claim. We have upheld findings of liability for both misrepresentation and promissory fraud where the record below supported each claim. See, e.g., Target Media Partners Operating Co. v. Specialty Mktg. Corp., 177 So.3d 843, 868-69 (Ala. 2013) (plurality opinion) (affirming the submission to a jury of claims of fraudulent misrepresentation and promissory fraud); Bethel v. Thorn, 757 So.2d 1154, 1160-61 (Ala. 1999) (reversing dismissal of actionable claims of promissory fraud, fraudulent misrepresentation, and fraudulent suppression); and Pinyan v. Community Bank, 644 So.2d 919, 922 (Ala. 1994) (addressing, although defendant relied heavily on the fact that some of the misrepresentations *247 were mere promises for the future, both ordinary fraud and promissory-fraud claims alleged in complaint because there were also misrepresentations as to existing fact). The only question here, however, is not whether evidence below tended to support promissory fraud (an issue we do not decide), but whether there was presented below substantial evidence from which a jury could conclude that the ARG defendants made misrepresentations of present, material fact. We have already concluded that the record supports a misrepresentation claim. We therefore find no error in the trial court's denial of a motion for a JML on this ground and agree with the trial court that, "regardless of whether [the wood dealers] may have also had an actionable promissory fraud cause of action, there was substantial evidence in front of the jury on all of the elements of the misrepresentation claims, the only tort claim that was submitted to the jury."
B. Claims Against Landegger
The ARG defendants argue that the trial court erred in denying Landegger's motion for a JML on the wood dealers' breach-of-contract and misrepresentation claims. We address the ARG defendants' arguments concerning each claim in turn.
As to the breach-of-contract claim, the parties dispute whether the wood dealers actually asserted a breach-of-contract claim against Landegger, the ARG defendants being in the curious position of arguing that the wood dealers did assert such a claim. The wood dealers dispute this, and the trial court agreed with the wood dealers in its postjudgment order, holding that "there was no such claim in the case for the court to consider for purposes of Landegger's motion for [a JML]."
To support their argument that a breach-of-contract claim against Landegger was essentially "smuggled" into this case and survives on appeal, the ARG defendants assert both that the complaint alleges and that the trial court charged the jury with a breach-of-contract claim against Landegger. As to the complaint, the ARG defendants argue that "the count for breach of contract demanded judgment against the 'Defendant s,' " which, the ARG defendants argue, included Landegger. Count four of the amended complaint provides as follows, in relevant part:
"37. At all time herein, Defendants APP [Alabama Pine Pulp Company, Inc.], ARP [Alabama River Pulp Company, Inc.], and/or Fictitious Defendants A-L were under a contractual obligation to pay the timber or wood prices agreed upon between the [wood dealers], and Defendants, including any BCAP matching payment, including those payments as represented by Defendants Landegger, Harris, and Fictitious Defendants A-L, who had actual and apparent authority to bind Defendants APP and ARP and/or Fictitious Defendants A-L to those representations, and who did thereby bind Defendants APP and ARP and/or Fictitious Defendants A-L to those representations.
"38. Defendants APP and ARP and/or Fictitious Defendants A-L breached their contractual obligations by failing and refusing to properly pay the amounts due under their agreement with [the wood dealers] thereunder.
"....
"WHEREFORE, [the wood dealers] demand judgment against Defendants in an amount of compensatory damages as will be determined by a jury at trial of this cause, plus interest and costs."
(Emphasis added.) The ARG defendants point to one word from the complaint-"Defendants"-to demonstrate that count four asserted a breach-of-contract claim *248 against Landegger. The ARG defendants give no further explanation, nor do they identify which of the 12 uses of the word "defendants" in count four includes Landegger.
As a plain reading of count four indicates, the allegations therein refer only to "Defendants APP, ARP [now collectively ARG] and/or Fictitious Defendants A-L." In paragraph 38 only "Defendants APP and ARP and/or Fictitious Defendants A-L" are alleged to have "breached their contractual obligations" to the wood dealers. The only reference to Landegger anywhere in count four is the allegation in paragraph 37 that "Landegger, Harris, and Fictitious Defendants A-L" had "actual and apparent authority to bind" and "did thereby bind Defendants APP and ARP and/or Fictitious Defendants A-L to those representations." (Emphasis added.) Landegger and Harris, therefore, are expressly excluded from the group of defendants accused of breach of contract, that group being repeatedly articulated in count four as the predecessor entities to ARG "and/or Fictitious Defendants A-L." In this context, the concluding demand for "judgment against Defendants" in count four would most naturally be read to be seeking judgment against the defendants specified in count four.[8] The ARG defendants make no arguments otherwise, and their bare assertion that the complaint alleges a breach-of-contract claim against Landegger is entirely unconvincing.
The ARG defendants also argue that this surreptitious breach-of-contract claim against Landegger survived the trial proceedings and was submitted to the jury. They point to two excerpts from the jury instructions where, according to the ARG defendants, the trial court "expressly instructed the jury that it could find against Mr. Landegger on this claim." The ARG defendants focus on three or four uses of the plural "Defendant s" by the trial court in its lengthy oral instructions. The wood dealers respond that they reiterated numerous times leading up to trial that they were not bringing a breach-of-contract claim against Landegger, beginning with their response to Landegger's summary-judgment motion. The wood dealers assert that, in the context of the entire jury charge, the evidence at trial, and their concessions, the jury instructions cannot be read as importing a breach-of-contract claim against Landegger. Finally, the wood dealers argue, the ARG defendants failed to object to the jury charge or seek clarification thereof.
It seems doubtful to us that a claim not found in the complaint and expressly disavowed by the plaintiffs before trial would somehow be formed whole cloth by a few lines in a lengthy jury instruction. But we need not decide such a question because, as the wood dealers note and the ARG defendants do not dispute, the ARG defendants made no specific and timely objection to these portions of the trial court's oral instruction.
"Based on Rule 51, [Ala. R. Civ. P.,] this Court has stated: '[T]o preserve his argument as to the jury instruction, [the appellant] must have: (1) objected before the jury retired to consider its verdict; (2) stated the matter that he was objecting to; and (3) supplied the grounds for his objection.' "
Chestang v. IPSCO Steel (Alabama), Inc., 50 So.3d 418, 433 (Ala. 2010) (quoting Ware v. Timmons, 954 So.2d 545, 558 (Ala. 2006) ). To preserve for appellate review *249 the issue of an allegedly erroneous instruction, an appellant "must adequately state specific grounds for his objection" at the close of the court's jury instructions, McElmurry v. Uniroyal, Inc., 531 So.2d 859, 860 (Ala. 1988), and thereby permit the trial court to correct any error immediately. Chestang, 50 So.3d at 433. The ARG defendants made no such objection to the trial court's instructions as to any breach-of-contract claim allegedly existing against Landegger.
We therefore conclude that the ARG defendants failed to adequately preserve for appellate review the issue whether the trial court's jury instructions introduced a claim of breach of contract against Landegger. Having held here that there was no breach-of-contract claim asserted against Landegger in the amended complaint, we have no reason to conclude that the trial court erred in denying Landegger's motion for a JML on this issue.
Next, the ARG defendants argue that Landegger made no misrepresentations in this case and that the trial court therefore erred in denying his motion for a JML on this claim. The parties do not dispute that Landegger never communicated directly with the wood dealers. The parties also concede that Landegger made the decisions that "ARG would (a) treat the portion of wood used to make black liquor as BCAP-eligible, and (b) pay the [w]ood [d]ealers the market price if the FSA did not pay as expected." The ARG defendants argue that, even so, neither decision constituted participating in a misrepresentation.
The wood dealers, citing Crigler v. Salac, 438 So.2d 1375 (Ala. 1983), respond that regardless of whether Landegger communicated directly to the wood dealers, a corporate officer like Landegger may be found individually liable for directing and participating in a fraud. In Crigler, the plaintiffs were farmers who sued Paul Crigler, the principal owner of Modern Mix, Inc., asserting that Crigler was personally liable in the storing and alleged conversion of the plaintiffs' grain stored in Modern Mix's storage bins. This Court in Crigler held that a corporate officer " 'may not participate in a tort perpetrated through the agency of a corporation, or in a fraudulent injury to another, without being civilly responsible.' " 438 So.2d at 1379-80 (quoting Rudisill Soil Pipe Co. v. Eastham Soil Pipe & Foundry Co., 210 Ala. 145, 150, 97 So. 219, 223 (1923) ). The Crigler Court explained:
"In order to hold an officer of a corporation liable for the negligent or wrongful acts of the corporation, 'there must have been upon his part such a breach of duty as contributed to, or helped bring about, the injury; that is to say, he must be a participant in the wrongful act.' Fletcher's Cyclopedia of Corporations, § 1137 at 208."
438 So.2d at 1380. The Crigler Court concluded that the "evidence [was] sufficient to show that Crigler, in managing Modern Mix, authorized, directed, or actively participated in the wrongful conduct, i.e. the conversion of plaintiffs' grain." Id. The wood dealers argue that, like Crigler's actions, Landegger's actions here render him personally liable.
Landegger was the owner of the company that operated the two ARG mills, and, as Harris stated at trial, Landegger "had the final word" on the major decisions to be made on the corporate level for the parent company and the ARG mill companies. The parties concede that Landegger approved the plan for ARG to certify as eligible for a BCAP subsidy the portion of wood used to make black liquor. Evidence introduced below also indicates that Landegger directly participated in conference calls with the USDA and learned that the *250 USDA's interpretation of the BCAP materials list was such that material used for black liquor was ineligible for BCAP subsidies. Rynearson, ARG's chief financial officer and Landegger's son-in-law, warned him of the same. Landegger admitted to knowing the risk being taken, therefore, when he approved ARG's policy of certifying for a BCAP subsidy the portion of wood used to make black liquor.
" 'It is a well settled rule in this state that a person is liable for the torts which he or she commits, regardless of the capacity in which that person acts.' " Inter-Connect, Inc. v. Gross, 644 So.2d 867, 869 (Ala. 1994) (quoting Chandler v. Hunter, 340 So.2d 818, 822 (Ala. Civ. App. 1976) ). Landegger certainly "cannot escape individual liability on the ground that he was acting in an official corporate capacity," 644 So.2d at 869, or on the ground that he did not directly communicate with the wood dealers. The evidence in this case was sufficient for a jury to conclude that, in the alleged scheme of misrepresentation in this case, Landegger authorized and directed his companies and his companies' employees in at least one of the essential components of the scheme: the crucial decision that ARG would certify as eligible for BCAP subsidies wood material used to make black liquor. The trial court, therefore, properly denied Landegger's motion for a JML on the individual misrepresentation claim against him.
C. Jury Instruction on Implied Contracts
The ARG defendants argue next that the trial court erred in instructing the jury on both implied contracts and express contracts, which the ARG defendants argue are "generally incompatible." See Kennedy v. Polar-BEK & Baker Wildwood P'ship, 682 So.2d 443, 447 (Ala. 1996). According to the ARG defendants, they did not dispute in the trial court the existence of the express oral contracts but only the terms of those contracts, which made "recovery on a theory of implied contract ... improper." See GE Capital Aviation Servs., Inc. v. Pemco World Air Servs., Inc., 92 So.3d 749, 764 (Ala. 2012). Therefore, they allege, no jury charge on implied contract should have been given.
The wood dealers respond that jury instructions on both implied contracts and express contracts were appropriate here because (1) the ARG defendants asserted counterclaims against the wood dealers alleging breach of an implied contract and (2) the ARG defendants "hotly contested" at trial the existence of an express contract. The wood dealers also note that in Kennedy, cited by the ARG defendants for the proposition that jury instructions on both implied contract and express contract are generally incompatible, this Court nevertheless went on to hold that both instructions may be sustained. See Kennedy, 682 So.2d at 447.
The record shows that in the trial court the ARG defendants did dispute, or appeared to dispute, both the terms and the existence of an express contract. In their answer to the first amended complaint, the ARG defendants admitted "that the wood dealers entered into contracts to sell wood to be delivered to [ARG]," but they denied the wood dealers' assertions regarding the terms of those contracts. At trial, witnesses for the ARG defendants described the prices promised to the wood dealers as mere "estimates" or "mathematical examples," and "not guarantees." On the other hand, the wood dealers testified that ARG promised them specific prices for their wood, testified about the prior course of dealing and the relationship between the parties, and described the general nature of the lumber industry, where agreements were often based on prior dealings. At the close of trial, the ARG defendants objected *251 to a jury instruction on implied contract but filed in open court their own proposed jury instruction stating: "The [wood dealers] claim that the [ARG] defendants defrauded them, were negligent in contracting with them, and then breached the alleged contract. The [ARG] defendants deny that there was a contract, that they breached any alleged contract, or defrauded the [wood dealers]." (Emphasis added.) Finally, in closing arguments, one attorney for the ARG defendants concluded his portion of the arguments by stating plainly: "And when y'all go out and make your decision, there's no contract here. There's no contract. And there's certainly-there's no fraud. And Ladies and Gentlemen, I'm going to ask you to return a verdict for all the defendants." (Emphasis added.)
The ARG defendants concede that there was evidence below to support a claim alleging the existence of express oral contracts, but they do not dispute the wood dealers' argument that there was also evidence introduced below to support a claim alleging the existence of implied contracts. Instead, the ARG defendants appear to argue that a claim of breach of an implied contract is always improper when there is evidence of the existence of an express contract. Although generally mutually exclusive, claims of breach of both express and implied contracts may be alternatively submitted to a jury where both theories of contract were "highly disputed and remained a question of fact." Kennedy, 682 So.2d at 447. As this Court held in Kennedy:
"In this case, existence of an express contract (allegedly formed by Kennedy's acceptance by performance of Polar-BEK's unilateral offer) was highly disputed and remained a question of fact, as did the alternative existence of an implied contract. Thus, the law may recognize an implied contract where the existence of an express contract on the same subject matter is not proven. Thus, it was for the jury to decide whether an express contract existed, or an implied contract, and we conclude that the trial court properly submitted both alternative contract theories to the jury."
682 So.2d at 447. The ARG defendants simply ignore this portion of Kennedy.
Moreover, in another case quoted by the ARG defendants, GE Capital Aviation Services, supra, this Court did not permit both claims of breach of express contract and of implied contract to proceed, not because it is never permissible, but because in that particular case the Court did not "find any evidence that would support an implied-contract theory." 92 So.3d at 764. However, in the present case, the parties disputed the terms of the alleged contracts between the parties, and, at times, the ARG defendants appeared to challenge even the existence of any contracts-express or implied. We conclude, therefore, consistent with our holding in Kennedy, supra, that the trial court did not exceed its discretion in giving jury instructions on both alternative breach-of-contract theories-express and implied-to the jury.
D. Denial of Continuance for Landegger and Excluding Portions of His Deposition
The ARG defendants argue that the trial court erred in denying a continuance of the trial, which was scheduled and was held during the period of Landegger's home confinement in Connecticut resulting from his federal criminal conviction. The ARG defendants also argue that the prejudice of Landegger's absence was compounded by the trial court's error in excluding positive character evidence regarding Landegger, which, they assert, was triggered by the wood dealers' counsel *252 impugning Landegger's character and "opening the door" to such evidence at trial.
As to the first issue, the ARG defendants argue that they were denied a fair trial because of the denial of the continuance and Landegger's subsequent inability to personally defend himself and ARG at trial. On May 26, 2015, Landegger was sentenced to 60 days' imprisonment in New York followed by 6 months' home confinement in Connecticut. One month later on June 26, 2015, the ARG defendants filed a motion in the trial court to continue the scheduled trial until the following civil jury term in 2016. In their motion, the ARG defendants argued that "it does not appear that [Landegger] will be available to appear for trial before the end of February 2016," that Landegger was "indispensable to the defense of this case," and that his absence "would adversely affect the presentation of his case and the cases of the other defendants." The ARG defendants added in their motion that they "come to this court with hats in hand" because Landegger had "previously requested that this case be continued before he was sentenced, and that they agreed to an August 24 trial date." Landegger's home confinement began on August 24, 2015, the first day of the scheduled trial.
On July 2, 2015, the trial court issued an order denying the ARG defendants' motion for a continuance. In its posttrial order, the trial court referred to this matter, explaining:
"As to Defendant Landegger's contention that he was unfairly prejudiced by being unable to appear at the trial, the court notes that it granted several continuances in this matter (pending for nearly 5 years), and offered to assist Landegger's counsel in obtaining a reprieve from house arrest to attend the trial, but was never asked to provide assistance. Defendant's counsel made no showing of any efforts to obtain an exemption from house arrest for the trial."
After the trial, at the very beginning of the Hammond / Green-Oil hearing, the trial court again raised the issue of Landegger's absence at the trial, apparently responding to the ARG defendants' assertion in posttrial motions that the court "excluded [Landegger] from his trial." The court asserted: "[W]ell, that's true and not true. But I want to put this on the record." The court continued:
"During the course of the trial I said to one of the defense counsel that if I could do anything-he was getting off on to house arrest as I understand. I said if I could do anything to get him-and this was off the record-to get him to come to the trial, sign anything, issue any order, I would do it. And the lawyer replied to me that they had checked with the New York counsel-his New York counsel, and it was either impossible or impractical, whichever. But I just want that on the record."
No comment in response to this statement, by any counsel, is reflected in the record. In their brief before this Court, the ARG defendants do not directly dispute this statement by the trial court but argue that the court's offer, "if made, was too late for Mr. Landegger to get to trial" and to prepare therefor. The ARG defendants argue that Landegger was prejudiced by the court's denial of a continuance because, they say, he was tried in absentia for fraud in a punitive-damages case, his absence "undoubtedly led the jury to make an adverse inference on his credibility," and he would have been an indispensable participant at trial, both on his own behalf and on behalf of ARG. Therefore, argue the ARG defendants, the trial court exceeded its discretion in not continuing the trial until Landegger could attend.
*253 Civil litigants in Alabama have no right to a continuance of a trial, nor do incarcerated parties have a right to personally attend or testify at trial.
"A trial judge has broad discretion to grant or deny a motion for continuance, Wood v. Benedictine Society of Alabama, Inc., 530 So.2d 801, 805 (Ala. 1988), and it is firmly established that continuances are not favored, and therefore the trial court's denial of a motion for continuance will not be reversed unless an abuse of discretion is shown. Selby v. Money, 403 So.2d 218, 220 (Ala. 1981) ; see Cramton v. Altus Bank, 596 So.2d 902 (Ala. 1992)."
Griffin v. American Bank, 628 So.2d 540, 542 (Ala. 1993). Moreover, incarcerated civil plaintiffs have no right to be brought to court to testify personally in a case unrelated to their confinement. Veteto v. Swanson Servs. Corp., 886 So.2d 756, 767 (Ala. 2003) (noting a "long line of opinions" following "unwaveringly" the rule that "an incarcerated civil plaintiff is not entitled to be brought from the penitentiary to testify in his own behalf"); Hubbard v. Montgomery, 372 So.2d 315, 316 (Ala. 1979) (holding that "a prisoner has no such right"); and Whitehead v. Baranco Color Labs, Inc., 353 So.2d 793 (Ala. 1977). Rather, the "proper course is to take his own oral or written deposition under Rule 30 or 31, [Ala. R. Civ. P.], to be used at trial as specifically provided in Rule 32(a)(3)(C), [Ala. R. Civ. P.]." Hubbard, 372 So.2d at 316.
In support of their argument that the trial court erred in denying a continuance, the ARG defendants provide only one footnote with a string cite of three cases: Lane v. Lane, 716 So.2d 1232 (Ala. Civ. App. 1998) ; Barbee v. Barbee, 624 So.2d 645 (Ala. Civ. App. 1993) ; and Gonzales v. Harris, 189 Colo. 518, 542 P.2d 842 (1975). Other than brief parenthetical descriptions, the ARG defendants do not apply the cases cited to the facts in the present case.
In Lane, the Court of Civil Appeals reversed a judgment of divorce and ordered a new trial because the trial court had denied a continuance requested by the wife, who did not have an attorney, and then, despite her collapsing in court and being taken away for medical evaluation, the court held a trial without her and divided the parties' assets. The lead opinion in Lane, authored by Retired Appellate Judge Wright, writing for the court, reversed the divorce judgment because of the indispensability of the wife's presence at trial and because the division of property was based upon "the uncertain testimony of the husband." 716 So.2d at 1234. Judge Wright's opinion also held that "the trial court abused its discretion in denying the wife's request for a continuance." Id. On the latter point, however, only Judge Thompson fully concurred. Three judges concurred in the result, with two of those judges writing that they disagreed with the lead opinion's holding on the continuance issue. One judge dissented entirely. Thus, on the continuance issue, only one judge agreed to reverse the trial court's judgment, one concurred in the result, and three expressly disagreed, making Lane a divided plurality decision that, at best, supports neither the wood dealers' position nor that of the ARG defendants.
In Barbee, the Court of Civil Appeals unanimously reversed a divorce judgment entered on default of the husband, who was pro se and incarcerated in prison. 624 So.2d at 645. The husband had moved for a continuance, alleging an inability to access research materials, and twice filed challenges to the wife's divorce complaint on the ground of improper venue. 624 So.2d at 645-55. On appeal, the Barbee court *254 found numerous errors in the trial court's rulings and failure to rule:
"There is nothing in the record, including the case action summary, that indicates any ruling by the court on the defense of improper venue; no setting of the case for hearing nor notice to the husband of a setting for trial; and no indication that any of the husband's motions were considered by the trial court or that his condition of imprisonment far from the courthouse was considered."
Barbee, 624 So.2d at 646. "For all these reasons" the Barbee court "reverse[d] the decree of divorce and remand[ed] for a new trial prefaced by proper motion and hearing and ruling on the motion of improper venue." Id. Additionally, although the court acknowledged "the problems which may arise in a case in which a prisoner is a party," ibr.US_Case_Law.Schema.Case_Body:v1">id., the Barbee court referred the husband to the court's comments on that matter in the case of Eastman v. Eastman, 429 So.2d 1058 (Ala. Civ. App. 1983). In Eastman, the Court of Civil Appeals rejected similar arguments by an incarcerated, pro se husband, noting that "a prisoner is not entitled in a civil case to have himself brought from the penitentiary to testify in his own behalf," 429 So.2d at 1058, but that the rules of discovery and evidence (namely, depositions and interrogatories) "are designed to effectively provide those in such a position as husband the constitutional safeguards of notice and opportunity to be heard." 429 So.2d at 1058.[9]
In the present case, Landegger, represented by able counsel, moved for a continuance two months before the scheduled trial date, a date to which the ARG defendants had agreed. When the ARG defendants filed the motion to continue on June 26, 2015, the litigation was in its fourth year and the trial court had already granted several continuances. The ARG defendants asserted in their motion that, "[u]nder the terms of his incarceration and home confinement, it does not appear that he will be available to appear for trial before the end of February 2016." Attached to the motion were the judgment, sentence, and supervised-release conditions for Landegger's federal crime. Under *255 "Special Conditions of Supervision" of Exhibit B, the document reads: "During this period of home confinement, the defendant may leave his home only to work, attend school, participate in religious services, and attend medical appointments for himself and his immediate family, and for such other activities approved by the Probation Office." The ARG defendants assert that, after he was released to home confinement in August 2015, the first week of trial in this case, Landegger had difficulties contacting his assigned probation officer and thus could not have obtained permission to travel. However, such matters occurring after the trial court's order are not relevant to whether the trial court exceeded its discretion at the time it denied the continuance motion. "[N]ormally, a reviewing court determines the correctness of a trial court's ruling as of the time when it was made and according to what the record shows was before the lower court at that time." Johnson v. State, 120 So.3d 1130, 1205-06 (Ala. Crim. App. 2009) (citations and quotations marks omitted). Based on the record as it was before the trial court when the motion for a continuance was filed, Landegger's conditions of home confinement provided that he could "leave his home" if attending the trial in Alabama was considered one of the "activities approved by the Probation Office." Despite this apparent option, and the trial court's apparent willingness to assist Landegger's counsel in obtaining a reprieve from house arrest to attend the trial in Alabama, the trial court stated in its posttrial order and again at the Hammond/Green Oil hearing that it was never asked to provide assistance. The ARG defendants do not dispute this. Therefore, based on the materials it had before it when the motion for a continuance was filed, the trial court may have concluded that Landegger still might have been able to attend the trial personally.
Furthermore, even if Landegger was indeed unable to attend the trial, the ARG defendants have not shown that the trial court exceeded its discretion in denying the motion for a continuance. In Barbee, the only majority opinion from an Alabama court cited by the ARG defendants, a default judgment was entered against an imprisoned, pro se husband where the trial court both ignored the threshold issue of improper venue and failed to give the husband proper notice of the trial date. By contrast, Landegger faced no "stacked deck" against him as did the incarcerated appellant in Barbee: there was no last-minute scramble for a continuance, no prerequisite matter (such as venue) to be resolved, no allegation that Landegger or his counsel did not receive proper notice or had had insufficient access to legal research or case materials, and no default judgment against him. When the ARG defendants' third motion to continue was filed, they noted that Landegger had already been deposed once and made no assertion that he could not be deposed again; thus, the trial court might have presumed Landegger had sufficient time to be deposed a second time before trial. Although out-of-state and unavailable parties may certainly desire, with good reasons, to be personally present at their trial, the Alabama Rules of Civil Procedure, as we said in Hubbard, expressly provide that, for situations like Landegger's, the "proper course [was] to take his own oral or written deposition under Rule 30 or 31, [Ala. R. Civ. P.], to be used at trial as specifically provided in Rule 32(a)(3)(C), [Ala. R. Civ. P.]." 372 So.2d at 316. Therefore, based on the facts before us, we do not believe the ARG defendants have demonstrated that the trial court exceeded its discretion in denying them a continuance of the trial date.
*256 Relatedly, the ARG defendants also argue that the trial court erred in excluding the admission of certain portions of Landegger's deposition to allegedly rebut the wood dealers having "open[ed] the door" with evidence meant to impugn Landegger's character. Specifically, the ARG defendants assert that the wood dealers' counsel "told the jury that Mr. Landegger had made a lot of money off the backs of people in Monroe County, sold his mills, taken the money, and left the county." The ARG defendants argue that, under the doctrine of curative admissibility, portions of Landegger's deposition describing more of his contributions to Monroe County and "the testimony of Pete Black to the same effect" should have been admitted to rebut the statements by the wood dealers' counsel. See 1 McElroy's Alabama Evidence § 14.01 (6th ed. 2009); Mutual Sav. Life Ins. Co. v. Smith, 765 So.2d 652 (Ala. Civ. App. 1998).
The record shows, however, that counsel for the wood dealers actually said the following:
"They want to talk about Mr. Landegger, Mr. Landegger came to Monroe County and the good things he has done. He has made a lot of money off the backs of the people in Monroe County. He has made a lot of money. And he has sold his mill and he has gone on."
In context, counsel was arguing to the jury that punitive damages should be assessed against the ARG defendants, who were accused of breach of contract and fraud. Counsel's brief mention of the "good things [Landegger] has done" for Monroe County and that he "made a lot of money" and then sold his mill and had "gone on" does not appear to be a patent attack on Landegger's character, at least not on a plain reading of a cold record. But that is why such matters as admissibility of evidence, including under the doctrine of curative admissibility, are matters within the " 'great discretion' " of the trial court, Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 71 (Ala. 2001) (quoting Sweeney v. Purvis, 665 So.2d 926, 930 (Ala. 1995) ), the same court that presided over the trial in real time and observed in person the demeanor, behavior, and statements of the attorneys and parties in the case. See Bowers, 827 So.2d at 72 (holding that, although questions on cross-examination may have "indirectly suggested [plaintiffs'] financial position, ... the trial judge was in the best position to determine the impact of those questions"). The trial court's ruling on the admissibility of evidence will not be disturbed on appeal unless the trial court exceeded its discretion. Id. at 71.
In the instant case, the only case cited by the ARG defendants to support their argument is Mutual Savings Life Insurance, supra. In Mutual Savings the Court of Civil Appeals did not reverse but affirmed an order granting a new trial because curative evidence was not permitted at trial after defense counsel characterized the defendant as a "small company," 765 So.2d at 655-56, holding that such an order was a proper exercise of discretion. Here, the trial court was likewise in the best position to discern whether the wood dealers' counsel had implicitly "opened the door" to otherwise inadmissible evidence regarding contributions Landegger had made to the Monroe County community. The ARG defendants have failed to demonstrate that the trial court in the present case exceeded this "great discretion" in excluding excerpts of Landegger's deposition.[10]
*257 E. Exclusion of the FSA State Committee Fact-Finding Report and the Wood Dealers' Letter
The ARG defendants argue next that the trial court erred in excluding two documents from admission at trial: (1) a memorandum prepared by the Alabama FSA State Committee and sent to the deputy administrator for farm programs in the USDA, dated March 11, 2010 ("the report"); and (2) a letter from several wood dealers to Landegger and Harris seeking "written confirmation of agreements made by [ARG] to us concerning ... BCAP ...." ("the wood dealers' letter"). We will address each document in turn and, again, consider "whether the trial court exceeded its discretion in excluding the evidence." Swanstrom v. Teledyne Cont'l Motors, Inc., 43 So.3d 564, 574 (Ala. 2009).
The report is a three-page memorandum on USDA-FSA letterhead, dated March 11, 2010, and addressed to the "Deputy Administrator for Farm Programs" from the "Alabama FSA State Committee." The ARG defendants even include a certification of their copy of the report signed by the then Secretary of Agriculture. The subject line reads: "Alabama River Pulp Company and Alabama Pine Pulp Company, Inc." The first heading of the main body reads: "Report on Fact-Finding Hearing." The report begins with its purpose:
"Pursuant to your request of March 9, 2010, the [State Committee] held a hearing for the subject entities for the purpose of fact finding for your office. The goal was to afford the Alabama River Pulp Company and Alabama Pine Pulp Company, Inc. the opportunity to present additional information for consideration before your issuance of a final adverse determination. At the hearing, recorded by a court reporter, the two BCF program participants (hereafter referred to as 'companies') were represented by attorneys, along with their staff from the two companies."
The report describes the hearing with ARG, reports the fact-finding that was made, and provides several recommendations to the deputy administrator about ARG and its relationship to BCAP. Most notably, according to the ARG defendants, is that the state committee in the report recommended that the deputy administrator, in his final determination, (1) "reinstate [the ARG mills] as eligible BCFs"; (2) "conclude that there was no 'scheme or devise [sic]' " on the part of ARG; and (3) consider that, although ARG failed to follow its BCAP certification agreement with the FSA, it did not do so "knowingly and willfully." The state committee also stated it was "unable to refer to any authority in the form of an Agency handbook or final rule to administer" BCAP and noted that the "[USDA's Notice of Funds Availability], a few BCAP Notices and web postings have been the only written authority for implementation of this massive program."
The parties do not dispute the relevance of the report; rather, they dispute whether *258 the report falls within the hearsay exception for "public records and reports" in Rule 803(8)(C), Ala. R. Evid. According to Rule 803(8)(C), the following are excepted from the hearsay rule:
"Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the state or governmental authority in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."
(Emphasis added.) The ARG defendants argue that the report is a public record and that, even though the deputy administrator did not accept the recommendations in the report, the report was "final" for the state committee's purposes and served as "an integral step in the administrative appeals process." Therefore, argue the ARG defendants, the trial court should have admitted the report under Rule 803(8)(C).
The wood dealers respond that the report should not be considered "factual findings" resulting from an "investigation"; rather, they argue, it was merely a "recommendation" with proposed factual findings to a higher authority in the FSA. Moreover, according to the wood dealers, the trial court properly exercised its discretion in excluding the report because it may have considered the report to have a "lack of trustworthiness" under Rule 803(8)(C) inasmuch as the findings and recommendations of the report had been rejected by the deputy administrator, the "ultimate decisional authority."
First, under Rule 803(8), the report is undeniably a "[r]ecord[ ], report[ ], statement[ ], or data compilation[ ], in any form," of a "public office[ ] or agenc[y]"-namely, a record or report generated by and for the USDA generally and the FSA specifically. Second, we disagree with the wood dealers that the report is not part of a fact-finding investigation because it was, they say, an intra-agency, nonfinal recommendation of only proposed findings of fact. The report facially identifies as a report on "a hearing ... for the purpose of fact finding" for the office of the deputy administrator and concludes with thanking the deputy administrator for the opportunity to conduct this "fact-finding effort." Moreover, the stated "goal" of the hearing, according to the report, "was to afford [ARG] the opportunity to present additional information for consideration before your issuance of a final adverse determination." Even if the recommendations made in the report were rejected by a higher ranking official, nothing about the report indicates it does not contain "factual findings resulting from an investigation pursuant to lawful authority." The report, up to this point in the analysis, qualifies rather easily under Rule 803(8)(C) as a "public record."
Third, however, " Rule 803(8) grants trial courts the discretion to exclude an otherwise qualified public record from evidence if 'the sources of information or other circumstances indicate a lack of trustworthiness.' " Swanstrom, 43 So.3d at 577. The Advisory Committee's Note to Rule 803(8)(C) expressly references as persuasive authority federal cases interpreting Federal Rule of Evidence 803(8)(C), including Hines v. Brandon Steel Decks, Inc., 886 F.2d 299 (11th Cir. 1989). See Rule 803(8)(C), Ala. R. Evid., Advisory Committee's Notes. According to the Advisory Committee's Notes, in Hines, the United States Court of Appeals for the 11th Circuit
"decided that 'legal conclusions' are not made admissible through Federal Rule 803(8)(C). The Hines opinion offers some guidance for distinguishing 'factual' conclusions *259 from 'legal' conclusions: 'Another way of looking at this inquiry is: Would the conclusion, if made by the district court, be subject to the clearly erroneous standard of review on appeal? If so, then the conclusion is factual; if not, then the conclusion is legal.' 886 F.2d at 303."
The 11th Circuit in Hines also quoted Advisory Comments to the federal rule that "set forth several considerations to aid in determining the trustworthiness of a public report: the timeliness of the investigation; the skill and experience of the investigator; whether the investigator held any sort of a hearing; and the investigator's impartiality. These considerations are not meant to be exhaustive." 886 F.2d at 303. See also II McElroy's Alabama Evidence § 266.01(4) (6th ed. 2009) (citing the same four factors to assess trustworthiness and noting that they are not exhaustive). Additionally, this Court has affirmed a trial court's exclusion of a toxicology report produced by the Federal Aviation Administration because the report suffered from several "missing links in the chain of custody of the blood samples," thereby lacking trustworthiness under Rule 803(8)(C). Swanstrom, 43 So.3d at 578.
In the present case, the report suffers from several considerations, both facially and external to it, that would indicate its untrustworthiness. First, as the wood dealers argued below and in this Court, the primary findings and recommendations in the report were ultimately rejected by the deputy administrator. To the extent that the ARG defendants wanted to introduce only the report as bearing the imprimatur of the federal agency administering BCAP, the intra-agency recommendations in the report were rejected by the deputy administrator on behalf of the FSA, meaning that the FSA's opinion on the ARG defendants' actions regarding BCAP, both before the report was issued and after in the final adverse determination, were consistently the opposite of the state committee's. The trial court might have considered the admission of a report extracted from the intermediate level of an administrative-appeals process to be largely misleading and confusing for the jury and more prejudicial than probative. "[P]ublic reports, otherwise admissible under Rule 803(8)(C), may nonetheless be excluded in whole or in part if the trial court finds that they are ... more prejudicial than probative." Hines, 886 F.2d at 302.
Second, the trial court may have considered the report to contain inadmissible legal conclusions inasmuch as the state committee recommended that the deputy administrator conclude that the ARG defendants employed "no 'scheme or devise [sic],' " that their failure to comply with BCF certification agreement was "not done knowingly and willfully," and that the written regulations governing BCAP were deficient or lacking entirely. Such legal opinions might be relevant to the claims of misrepresentation against the ARG defendants; indeed, the ARG defendants tout these very portions of the report as their reasons for desiring its admission. As legal opinions in a public record, however, they are generally inadmissible under Rule 803(8)(C). Compare Rule 803(8), Ala. R. Evid., Advisory Committee's Notes (noting that "a naked legal conclusion found in a police accident report could be excluded if it would not be helpful, as required by Ala. R. Evid. 701(b), or would not assist the trier of fact, as required under Ala. R. Evid. 702").
Third, the hearing conducted by the state committee was attended by and featured statements from only the ARG defendants. No other affected parties or witnesses were heard, rendering the hearing *260 and the fact-finding more of an echo chamber of the ARG defendants' positions and arguments rather than a fair investigative report.
Fourth, the state committee in the report confessed its own lack of expertise on BCAP, which it called a "very new" program, stating that "[i]t would certainly take more than a few hours to educate the [state committee] on BCAP to prepare itself to render comprehensive findings on these submitted facts."
Fifth, the conclusion portion of the report touts BCAP as "an economic stimulus for economic growth in rural Alabama" and notes that the then President was "pressing us to participate in job forum listening sessions." Therefore, warns the report, "we would be hard pressed to explain why USDA is making a decision that is so counterproductive to the big focus ... jobs ... jobs ... jobs." Such statements indicate a potential bias by the state committee in favor of pleasing the President by avoiding an FSA determination perceived to be contrary to the ARG defendants and, by extension, inhibitive of "economic growth in rural Alabama."
These five considerations, although not exhaustive, lend support to the trial court's decision to exclude the report as untrustworthy under Rule 803(8)(C) or as otherwise inadmissible. The ARG defendants have not demonstrated that the trial court exceeded its discretion in excluding the report from evidence at trial.
The ARG defendants also argue that the trial court erred in excluding the wood dealers' letter of June 18, 2010, sent to Landegger and Harris. Landegger and Harris did not sign the wood dealers' letter. The wood dealers' letter begins ominously by noting that, although ARG and the wood dealers formerly enjoyed a "good" business relationship, "things are changing." Citing the "imminent sale" of ARG's assets, the writers ask "for written confirmation of agreements made by [ARG] to us concerning ... BCAP" and posit two "points of agreement" concerning the promissory notes ARG asked the wood dealers to sign. The letter continues, however, and notes that, when ARG was suspended from BCAP, the amounts ARG advanced to the wood dealers via the promissory notes were less than the BCAP subsidy that was being paid before the suspension, leading to a difference that "will amount to a loss" for the wood dealers. The wood dealers' letter then proposes:
"Because of this we are requesting that in the event that a partial BCAP payment is made to the wood suppliers by the FSA along the lines as other competing mills percentages were paid, then all promissory notes will be voided. If any amounts are paid over above the percentages of the competing mills, then that amount will be returned to [ARG] as full payment of said promissory notes. This would somewhat satisfy most transactions that were made by wood suppliers during the BCAP period for which [ARG] made cash advances as referenced by promissory notes."
(Emphasis added.) The ARG defendants, who do not quote the portion of the letter set forth above, argue that the trial court erred in excluding the wood dealers' letter because the letter was written before the wood dealers had asserted a legal claim, the letter sought only to confirm existing business agreements, and the letter did not offer "valuable consideration" as compromise. See Rule 408, Ala. R. Evid. The wood dealers argue that the letter was plainly an offer to compromise and is therefore inadmissible under Rule 408. We agree.
*261 Rule 408 prohibits the admission of evidence of "furnishing or offering or promising to furnish-or accepting or offering or promising to accept-a valuable consideration in compromising or attempting to compromise the claim" when such evidence is "offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." Rule 408(a)(1). The broader scope of Rule 408, unlike at common law, prohibits even "conduct or statements made in compromise negotiations regarding the claim." Rule 408(a)(2). See also Rule 408, Ala. R. Evid., Advisory Committee's Notes (noting "breadth of exclusion" extended beyond common law). This Court summed up the "well established" principles regarding the admissibility of settlement communications as follows:
"The general rule is that offers of compromise by one party to another in a civil action, whether before or after the litigation is begun, [are] inadmissible. Glaze v. Glaze, 477 So.2d 435 (Ala. Civ. App. 1985). Alabama courts also recognize that conversations in connection with settlement negotiations are inadmissible. Chandler v. Owens, 235 Ala. 356, 179 So. 256 (1938). Negotiations looking to a compromise of controversies are privileged and inadmissible. See, Ford v. Bradford, 212 Ala. 515, 103 So. 549 (1925). Likewise, offers to perform that are conditional amount to mere efforts to settle a pending claim and are thus inadmissible. Yeager v. Hurt, 433 So.2d 1176 (Ala. 1983)."
Super Valu Stores, Inc. v. Peterson, 506 So.2d 317, 321 (Ala. 1987) (emphasis added).
In the instant case, the wood dealers' letter plainly moves from seeking to memorialize business agreements made under "good" times of old to an offer for a new and different arrangement made in light of "changing" and "imminent" circumstances. The very issues raised in the wood dealers' letter regarding the promissory notes and BCAP subsidies paid (and then suspended) are the same issues that, just a few months after, crystallized into an actual lawsuit between the wood dealers and the ARG defendants. Thus, the ARG defendants' argument that the wood dealers' letter was sent before the wood dealers had asserted their claims (or the ARG defendants their counterclaims) is not dispositive because the prohibition in Rule 408 generally applies "whether before or after the litigation is begun." Super Valu Stores, 506 So.2d at 321. See also I McElroy's Alabama Evidence § 188.01(1) & (4) (6th ed. 2009) (same). Nor can we agree that the wood dealers' letter sought only to outline existing agreements. Rather, the letter proposed two conditional proposals: If a lower BCAP subsidy is paid comparable to what other mills were generating then the promissory notes would be voided, but, if any BCAP subsidies are made that are higher than those found at the other mills then the overage goes to ARG as full payment of the promissory notes. This offer would purportedly "somewhat satisfy most transactions that were made by wood suppliers during the BCAP period for which [ARG] made cash advances as referenced by promissory notes." This is plainly an offer to compromise, including an offer to furnish (or accept) valuable consideration in the form of voiding the promissory notes or paying ARG a portion of the BCAP subsidy, and is therefore prohibited. Indeed, even if the offer did not specify any valuable consideration as required in Rule 408(a)(1), the wood dealers' letter could be considered "conduct or statements made in compromise negotiations regarding the claim" under Rule 408(a)(2). See Kaufman v. Kaufman, 934 So.2d 1073, 1079 (Ala. Civ. App. 2005) ("Any evidence pertaining to offers of compromise *262 between the parties is not admissible." (citing Super Valu Stores, 506 So.2d at 321 )).
We therefore reject the ARG defendants' arguments in favor of the admissibility of the wood dealers' letter as contrary to the broad, well established rule against the admission of offers to compromise under Rule 408. The trial court did not exceed its broad discretion in excluding the wood dealers' letter from evidence.
The ARG defendants have failed to demonstrate reversible error in the trial court's and the jury's determination of their liability to the wood dealers.
We turn now to the compensatory and punitive damages awarded.
F. Compensatory Damages
The ARG defendants argue that the compensatory damages awarded the wood dealers are excessive and largely unsupported by the evidence. They ask this Court to remit the total compensatory-damages award from $1,092,692.71 to $313,528.82. The wood dealers disagree and argue that, as the trial court held in its posttrial order, the compensatory damages are supported by the evidence and that it was within the independent discretion of the jury to award that amount, even though it is greater than the amount the wood dealers demanded.
Our review of an award of compensatory damages is guided by the following well established principles:
" 'The authority to disturb a jury verdict on the ground of excessiveness of damages is one which should be exercised with great caution....
" '....
" 'We begin by recognizing that the right to a trial by jury is a fundamental, constitutionally guaranteed right, Art. I, § 11, Const. of 1901, and, therefore, that a jury verdict may not be set aside unless the verdict is flawed, thereby losing its constitutional protection. It is only in those cases that a trial court, pursuant to [Ala]. R. Civ. P. 59(f), and this Court, pursuant to [Ala.] Code 1975, § 12-22-71, may interfere with a jury verdict. Insofar as damages are concerned, a jury verdict may be flawed in two ways. First, it may include or exclude a sum which is clearly recoverable or not as a matter of law, or which is totally unsupported by the evidence, where there is an exact standard or rule of law that makes the damages legally and mathematically ascertainable at a precise figure. In these situations, a trial court may, and should, reduce or increase the amount of the verdict to reflect the amount to which the parties are entitled as a matter of law. Second, a jury verdict may be flawed because it results, not from the evidence and applicable law, but from bias, passion, prejudice, corruption, or other improper motive. It is this category of cases that most troubles both trial and appellate courts.
" 'The cases have consistently held that in deciding whether a jury verdict is excessive because it is the result of passion, bias, corruption, or other improper motive, a trial judge may not substitute his judgment for that of the jury. We have also recognized that the trial judge is better positioned to decide whether the verdict is so flawed. He has the advantage of observing all of the parties to the trial-plaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review trial court action *263 in this sensitive area, although increasingly they are required to do so.' "
National Ins. Ass'n v. Sockwell, 829 So.2d 111, 133 (Ala. 2002) (quoting Hammond v. City of Gadsden, 493 So.2d 1374, 1378-79 (Ala. 1986) ). In the present case, the ARG defendants do not assert that the verdict is flawed under the second category listed above (i.e., that the verdict is the result of bias, prejudice, etc.); rather, they argue that, under the first category, the evidence does not support the full amount awarded by the jury.
On appellate review, we presume a jury verdict is correct, " 'and that presumption is strengthened by the trial court's denial of a motion for a new trial.' " Line v. Ventura, 38 So.3d 1, 8 (Ala. 2009) (quoting Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31 (Ala. 1999) ). Further, we " 'must consider the evidence in the light most favorable to the prevailing party, and ... will set aside the verdict only if it is plainly and palpably wrong.' " Id. The focus of our review is on "what amount a jury, in its discretion, may award, viewing the evidence from the plaintiff's perspective." First Commercial Bank v. Spivey, 694 So.2d 1316, 1326 (Ala. 1997). The amount of damages awarded to a plaintiff must be "reasonably certain" but is not held to a strict numerical standard:
" '[D]amages may be awarded only where they are reasonably certain. Damages may not be based upon speculation.... However, "this does not mean that the plaintiff must prove damages to a mathematical certainty.... Rather, he must produce evidence tending to show the extent of damages as a matter of just and reasonable inference." C. Gamble, Alabama Law of Damages § 7-1 (2d ed. 1998), as cited in Industrial Chemical [& Fiberglass Corp. v. Chandler, 547 So.2d 812, 820 (Ala. 1988) ]. The rule that one cannot recover uncertain damages relates to the nature of the damages, and not to their extent. If the damage or loss or harm suffered is certain, the fact that the extent is uncertain does not prevent a recovery.' "
Deng v. Scroggins, 169 So.3d 1015, 1026 (Ala. 2014) (quoting Jamison, Money, Farmer & Co. v. Standeffer, 678 So.2d 1061, 1067 (Ala. 1996) ). A court "may not conditionally reduce a jury verdict merely because it believes the verdict overcompensates the plaintiff." First Commercial Bank, 694 So.2d at 1326.
The jury awarded the wood dealers the following compensatory damages, respectively:
Ayres: $76,876.17 BAR: $178,536.88 Conecuh: $248,932.22 Dry Creek: $343,634.87 Pea River: $109,670.88 Pineville: $98,542.50 TTC: $36,499.19 _________ _____________ TOTAL: $1,092,692.71
The ARG defendants argue that the compensatory damages awarded to the wood dealers are excessive in two ways: (1) the wood dealers "inflated" their own damages by $682,349.94[11] and (2) the jury *264 awarded the wood dealers "almost $100,000 more than the [w]ood [d]ealers themselves calculated and demanded."
On the first point, the ARG defendants argue that the proper measure of compensatory damages in this case is the following formula: the total of the discounted price paid to the wood dealers by ARG, plus the full BCAP subsidy value for wood identified as BCAP wood and delivered to ARG from December 21, 2009, to April 30, 2010, minus the total amounts paid by ARG and FSA for BCAP wood delivered to ARG for the same date range. The ARG defendants provide a general citation to Hammond, but they do not challenge this portion of the compensatory-damages award as a matter of law; they appear to be arguing that this "inflated" portion of the compensatory damages is "unsupported by the evidence." Hammond, 493 So.2d at 1378. They list several categories that should not have been included in the damages award: e.g., wood that was not identified as BCAP wood or that was delivered after BCAP ended, wood delivered to other mills, or "credits" due to the ARG defendants for undiscounted prices they paid or BCAP subsidies the wood dealers received. Based on the ARG defendants' preferred formula, therefore, the respective damages for each plaintiff should have been as follows:
Ayres: $19,365.89 BAR: $0 Conecuh: $68,638.88 Dry Creek: $64,714.73 Pea River: $59,574.58 Pineville: $73,163.55 TTC: $28,071.19 _________ ___________ TOTAL: $313,528.82
By these calculations, the ARG defendants assert that the wood dealers' award should be reduced by $682,349.94 and provide extensive record citations to support their proposed calculations.
The wood dealers argue that the ARG defendants place before this Court the same figures and formulas that the ARG defendants presented to the jury below but ignore the evidence that the wood dealers put before the jury to support their damages claims. For example, the wood dealers note, John Ayres of Ayres Forestry testified on direct examination that he produced a "detailed ticket listing out of my accounting program, detailing every ticket that I hauled from the time I signed [up for BCAP] through the BCAP period of April 30th." This ticket listing was entered into evidence as Plaintiffs' Exhibit 305A. Ayres explained his calculations provided in Exhibit 305A:
"Q. [Counsel for wood dealers:] That calculation was done off BCAP settlement detail sheets that [ARG] gave you?
"A. Right off the scale tickets.
"Q. That they gave you?
"A. Yes.
"Q. Okay. And the detailed listing of the amount of tons and the location and the date, that's all-those are all business records that are kept in your office?
"A. Correct.
*265 "Q. And they're generated from the [ARG] settlement tickets that you received from [ARG]?
"A. Right.
"Q. All right. Now, tell the jury what you've done to calculate your damage, other than what you told me, how you came up with the total there on the back page.
"A. So what I'm claiming is that I should be due a BCAP settlement, a BCAP matching payment for every load of wood I hauled from the time I signed AD-245 and became an [Eligible Materials Owner under BCAP] until the time the program ended.
"Q. Okay.
"A. And I calculated my eligible dry tons times the forty-five dollars a ton and came down there with a total. And then I subtracted the monies that I was paid by the FSA.
"Q. All right. Hold on. Before we get to that amount, tell me-so you took essentially the number that Mark Bond gave you, compared it to the BCAP settlement sheets, multiplied that times the number of tons that you hauled, according to your business records. All right. And then what was the total that you came up with that you should have been paid?
"A. Two hundred and twenty-three thousand one hundred and nineteen dollars and fifty-two cents."
Ayres continued his testimony, discussing what his final damages figure did not include:
"Q. All right. And then what did you subtract from that amount?
"A. Then I subtracted the monies that I actually received from the FSA.
"Q. Okay.
"A. Then I subtracted the promissory notes.
"Q. Okay.
"A. And then on the back page, I subtracted eight dollars a ton for all the other tons that I hauled under the blue card.
"Q. Okay.
"A. And for a net of fifty-nine thousand one hundred and thirty-five dollars and seventy-nine cents.
"Q. Okay. Why did you subtract the eight dollars a ton?
"A. Well, the eight dollars a ton was what Mark and I agreed on. And even though it was not supposed to be subtracted and even though [ARG] was not supposed to get financial gain off of my wood, I subtracted it because that's what we had agreed on.
"Q. All right. And so you've taken that into account, right?
"A. Yes, sir.
"Q. And you've taken into account the amount you received from the FSA, the BCAP payments?
"A. Right.
"Q. And you've already subtracted the promissory notes that they claimed from you?
"A. Right."
On cross-examination, counsel for the ARG defendants thoroughly questioned Ayres on his figures and methodology and offered into evidence exhibits for the defense. Additionally, counsel for the ARG defendants also offered into evidence several exhibits related to Ayres's calculations. Like John Ayres, each of the other six wood dealers had a representative witness testify to their respective company's damages and underlying calculations in much the same way. And for each witness, the ARG defendants cross-examined (and re-crossed) him, countered with their own *266 evidence, and, in their case-in-chief, presented expert testimony.
In their appellate attack on this portion of the compensatory damages, the ARG defendants are essentially asking this Court to reexamine the competing arithmetic of the parties, to reweigh the competing testimony and exhibits, and to substitute the jury's verdict with the ARG defendants' formula of the appropriate final sum. Just as "[a] trial court may not substitute its judgment for that of the jury when the jury has returned a compensatory verdict that is supported by the record," Spivey, 694 So.2d at 1326, neither may this Court.
Witnesses for every wood dealer testified to the amount of, and the calculations used to determine, their requested damages, and supporting documentation was entered into evidence. Deferring as we must to the fact-finder, a judgment bolstered by the trial court's posttrial ruling in the plaintiffs' favor, Line, 38 So.3d at 8, we hold that the ARG defendants have not met their burden of showing that this portion of the compensatory damages was "inflated" beyond the evidence submitted at trial to the jury.
In their second challenge to the compensatory damages, the ARG defendants argue that the jury's award exceeded what the wood dealers demanded by a total of $96,813 and that the damages should be remitted accordingly.[12] We note that the "extra" compensatory damages awarded do not appear patently consistent in amount or ratio from plaintiff to plaintiff, ranging anywhere from merely $1,117 more than demanded for Dry Creek up to $25,309 more than demanded for Pea River. Because the jury signed general verdict forms that provided one compensatory-damages award for both claims for which the ARG defendants were found liable (breach of contract and misrepresentation), we cannot assign any clear division of the award between the claims.
The ARG defendants' first argument against these "extra" damages is that, as a matter of law, the wood dealers could not recover damages on the contract and also recover reliance damages, citing Goolesby v. Koch Farms, LLC, 955 So.2d 422 (Ala. 2006). As this Court held in Goolesby, " 'reliance damages,' are generally awarded in lieu of, not in addition to, expectation damages," 955 So.2d at 429, for breach-of-contract claims. However, the ARG defendants ignore the fact that the wood dealers successfully prosecuted the ARG defendants for fraudulent misrepresentation; this is not merely a breach-of-contract case. Therefore, and as a matter of law, the wood dealers are " 'entitled to damages for all injuries proximately caused by' " the ARG defendants' misrepresentation. Morris, 228 So.3d at 987 (quoting Kidder v. AmSouth Bank, N.A., 639 So.2d 1361, 1363 (Ala. 1994) ). The ARG defendants do not dispute this argument but, instead, pivot to their second argument against these "extra" damages: that the evidence was insufficient to support the jury's award of such "extra" reliance damages. The ARG defendants concede that THE Timber Company presented evidence of increased transportation costs, that Dry Creek presented evidence of what other mills paid it, and that there was testimony on behalf of each of the wood dealers about higher stumpage costs, but they argue that not all the wood dealers produced such evidence and that *267 there was no evidence of the total amounts of these costs. In support, the ARG defendants cite, without elaboration, Aldridge v. Dolbeer, 567 So.2d 1267 (Ala. 1990), in which this Court held that "[t]he plaintiff has the burden of producing sufficient evidence of his loss to allow the factfinder to calculate the damages without operating from guesswork." 567 So.2d at 1270 (citing Johnson v. Harrison, 404 So.2d 337 (Ala. 1981) ).
As noted above, however, the wood dealers' witnesses did not leave the jury to calculate their damages by guesswork. Rather, the wood dealers testified in varying detail to their economic harm incurred and also itemized the amounts they did not include in their final damages figure, including BCAP subsidies received and the "advances" received from ARG with promissory notes. They testified to the economic hardship they suffered by continuing to haul their wood to ARG after ARG's suspension from BCAP. For example, as Ayres testified, he tallied his gross total for what he believed he "should have been paid" to be $223,119.52. From that number, he testified that he subtracted the BCAP subsidies he received from the FSA, the amount of the promissory notes from ARG, and, finally, $8 per ton for wood he hauled to ARG that was not eligible for a BCAP subsidy. As Ayres explained: "Well, the eight dollars a ton was what Mark and I agreed on. And even though it was not supposed to be subtracted and even though [ARG] was not supposed to get financial gain off of my wood, I subtracted it because that's what we had agreed on." (Emphasis added.) For any one or all of those reasons, the jury may have taken the testimony of those wood dealers who presented more exacting calculations of their increased transportation costs (THE Timber Company) or the amounts other mills paid them (Dry Creek) and applied those figures as estimated damages applicable to some of or all the other similarly situated wood dealers. In its discretion, the jury may have seen fit to include certain amounts of the damages that even the wood dealers (like Ayres) thought should be credited to the ARG defendants' benefit, including the amount the ARG defendants required the wood dealers to discount their prices during the BCAP, thus raising the total compensatory-damages award.
The question is not whether this Court's (or the trial court's) arithmetic might yield different numbers, and we decline the ARG defendants' implicit invitation to measure the "extra" compensatory damages awarded with "mathematical certainty." "If the evidence furnishes data for an approximate estimate of the amount of damages, it is sufficient to support a judgment." J.M. Marsh, Alabama Law of Damages § 2:7 (6th ed. 2012). We hold that the "extra" compensatory damages, like the bulk of the award, is adequately supported by the record before us and that the ARG defendants have not met their burden of showing otherwise.
G. Punitive Damages
The ARG defendants appeal the trial court's denial of their motion for a JML on the punitive damages awarded to the wood dealers, arguing that no punitive damages should have been awarded or, alternatively, that the punitive-damages award should be remitted. We address each alternative argument in turn.
1. Clear and Convincing Evidence
The ARG defendants first argue that no punitive damages should be awarded in this case because, they say, the wood dealers did not prove "by clear and convincing evidence" that the ARG defendants engaged in "oppression, fraud, wantonness, *268 or malice with regard to the plaintiff[s]," as required by § 6-11-20(a), Ala. Code 1975. "[C]lear and convincing evidence" is defined in § 6-11-20(b)(4) as follows:
"Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
We have repeatedly explained how, as here, a trial judge ruling on a motion for a JML should be guided by this clear-and-convincing-evidence standard:
" '[T]he "clear and convincing" standard requires the trial judge to do more than merely determine whether the nonmoving party has presented substantial evidence to support the claim for punitive damages. It is not the trial judge's function when ruling on a directed verdict [now referred to as a JML] or J.N.O.V. [now referred to as a postverdict JML] motion to weigh the evidence; rather, he must view the evidence in a light most favorable to the nonmoving party. If in viewing the evidence in that light the judge reasonably can conclude that a jury could find the facts in favor of the nonmovant and that the jury could be firmly convinced of that decision after considering the evidence in opposition, then the judge should deny the motion.' "
Cheshire v. Putman, 54 So.3d 336, 342 (Ala. 2010) (quoting Cessna Aircraft Co. v. Trzcinski, 682 So.2d 17, 19 (Ala. 1996) ) (emphasis added).
In applying the clear-and-convincing-evidence standard, the ARG defendants urge this Court to "weigh the conflicting evidence," echoing Justice Houston's special concurrence in Hunt Petroleum Corp. v. State, 901 So.2d 1, 18 (Ala. 2004).[13] See also Hobart Corp. v. Scoggins, 776 So.2d 56, 58-60, 66 (Ala. 2000) (finding substantial evidence of liability for wantonness, but not clear and convincing evidence of punitive damages). To the extent the ARG defendants may be urging this Court to engage in a weighing (or reweighing) of the evidence submitted to the jury below, both the relevant statute and cases compel us to decline. On its face, the statutory definition of "clear and convincing" in § 6-11-20(b)(4) requires that the evidence favoring the plaintiff be "weighed against evidence in opposition," but the next phrase makes it express that the "weighing" is to be done by "the trier of fact." (Emphasis added.) In the present case, the trier of fact was the jury, not the trial court. Moreover, just as it is " 'not the trial judge's function when ruling on a ... [... postverdict JML] motion to weigh the evidence,' "
*269 Cheshire, 54 So.3d at 342, it is not, a fortiori, this Court's function to "weigh the evidence" on appeal. Rather, as we have said more than once, an Alabama appellate court's review of a ruling on a motion for a JML is guided by
" '[t]he purely objective standard of whether the party having the burden of proof has produced proof to create an issue requiring resolution by a jury,' although when this Court reviews the ruling on such a motion, 'the evidence must be reviewed in the light most favorable to the nonmoving party.' "
Ferguson v. Baptist Health Sys., Inc., 910 So.2d 85, 95 (Ala. 2005) (quoting Coca-Cola Bottling Co. United v. Stripling, 622 So.2d 882, 884 (Ala. 1993) ) (emphasis added). We conclude, therefore, that the task of this Court, in reviewing the trial court's denial of the ARG defendants' motion for a JML challenging the award of punitive damages under § 6-11-20, is not to weigh the evidence on either side like a trier of fact but, rather, to determine whether the judge could have reasonably concluded that " 'a jury could find the facts in favor of the nonmovant and that the jury could be firmly convinced of that decision after considering the evidence in opposition.' " Thomas v. Heard, 256 So.3d 644, 659 (Ala. 2017) (plurality opinion) (quoting Cessna Aircraft, 682 So.2d at 19 ). See also Wholesale Motors, Inc. v. Williams, 814 So.2d 227, 230 (Ala. 2001) (holding that "jury could have reasonably concluded that Williams's evidence regarding Wholesale Motors' misrepresentations about the mileage was 'clear and convincing' ").
The trial court below denied the ARG defendants' renewed motion for a JML as to punitive damages, holding that the demand for punitive damages was properly submitted to the jury and ruling that "the evidence presented demonstrated by clear and convincing evidence the reprehensible actions of the [ARG] defendants, which included a scheme to profit off of a government stimulus program and timber dealers." The trial court concluded that "[t]he jury heard evidence from which it reasonably could have concluded that [the ARG] defendants consciously and deliberately engaged in fraud in its representations to [the wood dealers] causing substantial harm." The ARG defendants argue that the wood dealers failed to produce clear and convincing evidence of "oppression, fraud, wantonness, or malice"-the four categories specified in § 6-11-20. "Fraud" is expressly defined in § 6-11-20(b)(1) as follows:
"An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious[14] and committed with the intention on the part of the defendant of thereby depriving a person or entity of *270 property or legal rights or otherwise causing injury."
To support their argument that there was no clear and convincing evidence of fraud, however, the ARG defendants do not argue that the wood dealers failed to "produce[ ] proof to create an issue requiring resolution by a jury," Ferguson, 910 So.2d at 95, but, instead, assert that BCAP "lent itself to misunderstanding" and that the wood dealers may have "misunderstood" what ARG defendants promised them, especially as to the meaning of the promise to "make them whole." These arguments, however, invite us simply to review the ARG defendants' evidence and to adopt their view of the key facts underlying the alleged fraud. Not only does this approach ignore the wood dealers' hours of witness testimony, hours of argument, and hundreds of documents, but it also asks us to view the facts in favor of the moving party. Such an approach would turn our appellate standard of review on its head.
Based on our review of the record, we find clear and convincing evidence from which a jury could find that ARG and/or Landegger intentionally misrepresented to the wood dealers material facts about BCAP, about the status of the ARG mills as qualified BCFs after ARG's suspension from BCAP, and about whether wood material delivered to ARG's mills was eligible for a BCAP subsidy. Moreover, there was clear and convincing evidence that these intentional misrepresentations were designed to use BCAP to lower the price paid to the wood dealers, depriving the latter of "property or legal rights or otherwise causing injury" to them. We conclude, therefore, that "there was evidence of such quality and weight that a jury of reasonable and fair-minded persons could find by clear and convincing evidence that the defendant consciously or deliberately engaged in fraud." Ex parte Norwood Hodges Motor Co., 680 So.2d 245, 249 (Ala. 1996). The trial court did not err in denying the ARG defendants' motion requesting that the punitive-damages award be vacated.
2. Remittitur of Punitive Damages
Alternatively, the ARG defendants argue that the punitive damages awarded are excessive and should be remitted. The jury awarded the wood dealers a combined total of $1,092,692.71 in compensatory damages plus $1,000,000 each in punitive damages. Upon the ARG defendants' unopposed motion to reduce the punitive damages according to the statutory cap set forth in § 6-11-21, Ala. Code 1975,[15] the trial court reduced the respective damages as follows:
*271 Plaintiff Compensatory Punitive Combined Ayres: $76,876.17 $711,200 $788,076.17 BAR: $178,536.88 $711,200 $889,736.88 Conecuh: $248,932.22 $746,796.66 $995,728.88 Dry Creek: $343,634.87 $1,000,000 $1,343,634.87 Pea River: $109,670.88 $711,200 $820,870.88 Pineville: $98,542.50 $711,200 $809,742.50 TTC: $36,499.19 $711,200 $747,699.19 ___ _____________ Total: $6,395,489.37
After a Hammond / Green Oil hearing, the trial court denied the ARG defendants' motion for further remittitur.
Generally, "the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future." Green Oil Co. v. Hornsby, 539 So.2d 218, 222 (Ala. 1989). Therefore, punitive damages "must not exceed an amount that will accomplish society's goals of punishment and deterrence." Id. More specifically, we have laid out the following guideposts and factors for reviewing de novo the amount of a punitive-damages award:
" 'In reviewing a punitive-damages award, we apply the factors set forth in Green Oil [Co. v. Hornsby, 539 So.2d 218 (Ala. 1989) ], within the framework of the "guideposts" set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed. 2d 809 (1996), and restated in State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed. 2d 585 (2003). See AutoZone, Inc. v. Leonard, 812 So.2d 1179, 1187 (Ala. 2001) ( Green Oil factors remain valid after Gore ).
" 'The Gore guideposts are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Campbell, 538 U.S. at 418, 123 S.Ct. 1513. The Green Oil factors, which are similar, and auxiliary in many respects, to the Gore guideposts, are:
" ' "(1) the reprehensibility of [the defendant's] conduct; (2) the relationship of the punitive-damages award to the harm that actually occurred, or is likely to occur, from [the defendant's] conduct; (3) [the defendant's] profit from [its] misconduct; (4) [the defendant's] financial position; (5) the cost to [the plaintiff] of the litigation; (6) whether [the defendant] has been subject to criminal sanctions for similar conduct; and (7) other civil actions [the defendant] has been involved in arising out of similar conduct."
" ' Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala. 2003) (paraphrasing the Green Oil factors).' "
CNH America, LLC v. Ligon Capital, LLC, 160 So.3d 1195, 1211 (Ala. 2013) (quoting Ross v. Rosen-Rager, 67 So.3d 29, 41-42 (Ala. 2010) ). We will address each guidepost and factor in turn.
a. Gore Guidepost 1: Degree of Reprehensibility
" '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility *272 of the defendant's conduct.' " Campbell, 538 U.S. at 419 (quoting Gore, 517 U.S. at 575 ). When analyzing this first Gore factor, Campbell counsels courts to consider whether
"the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."
538 U.S. at 419. The ARG defendants argue that their conduct was not reprehensible. We disagree.
According to the Campbell rubric, the first two considerations do not support a finding of reprehensibility on the part of the ARG defendants: the harm caused by the ARG defendants was not physical and did not demonstrate a disregard for anyone's health or safety. The next three considerations, however, support a finding of reprehensibility. As to the "financial vulnerability" of the plaintiffs, the ARG defendants argue that the wood dealers were not "elderly, poor, disabled, or illiterate" but were "successful businessmen." The ARG defendants cite no support for the idea that businessmen (or businesses) cannot be considered "financially vulnerable." In the instant case, the purpose of BCAP was to provide assistance for wood dealers in a struggling economy, not to provide a financial windfall for paper mills. But the ARG defendants positioned themselves as the BCAP experts and "gatekeepers" to the BCAP subsidies and urged as many wood dealers as they could to sell them wood at a discounted price. When the FSA suspended ARG from BCAP, thereby prohibiting any wood dealer from obtaining a BCAP subsidy for wood delivered to ARG's mills, the ARG defendants doubled down and told the wood dealers to continue delivering wood to ARG's mills anyway. For example, Malcolm Smith, president and part-owner of Conecuh Timber, testified that Conecuh was "going in the red" because it had contracted to pay timberland owners a higher price for their timber based on the ARG defendants' promise that Conecuh would receive a BCAP subsidy for the wood it delivered to ARG's mills. Terry Chapman, Conecuh's CEO, stated that Conecuh was "running out of cash and couldn't borrow any more money to operate on." Tommy Mosley, co-owner of Pineville Timber, testified that he asked ARG if he could "just continue like we are" and was told: "If you want to do business with [ARG], you are going to do BCAP." When asked at trial about whether he had had a choice to sign the promissory notes, Mosley responded: "Yes, sir, we could go out of business or we could stay in business. That was our choice." Moreover, ARG responded to the financial crisis of the wood dealers no longer receiving BCAP subsidies by paying them what they called an "advance" to compensate them in part, but they also made the wood dealers sign promissory notes therefor. In short, the ARG defendants used BCAP subsidies against the wood dealers for their own profit and responded to the wood dealers' deepening financial vulnerability by converting the wood dealers' losses into debts owed to ARG and enforced by a countersuit. We find ample evidence from which to conclude that the wood dealers were financially vulnerable and became more so throughout the duration of ARG's manipulation of BCAP.
As to the last two considerations of reprehensibility, the conduct of the ARG defendants involved repeated misrepresentations to the wood dealers to induce, and *273 then to keep them, delivering wood to ARG's mills. Their decision to certify as eligible for a BCAP subsidy wood used to make black liquor affected every wood dealers' delivery to ARG's mills during BCAP. The misrepresentations here were not isolated incidents, and the ARG defendants' argument in their brief that BCAP was a "one-time program" lasting a few months is inapposite. Moreover, the harm to the wood dealers was caused, we have already held, by the ARG defendants' intentional misrepresentations.
In sum, three of the five Campbell factors support a finding of reprehensibility regarding the ARG defendants' conduct toward the wood dealers.
b. Gore Guidepost 2: Disparity Between Harm that Occurred and Punitive-Damages Award
Under the second Gore guidepost, the Campbell Court refused to impose a "bright-line ratio" of punitive damages to compensatory damages and reiterated its reluctance to "identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. 517 U.S. at 582 ('[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award'); TXO[ Production Corp. v. Alliance Res. Corp., 509 U.S. 443], 458 [ (1993) ]." Campbell, 538 U.S. at 424-25. The Court continued, however, to note that its jurisprudence demonstrated that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 425. Because there are "no rigid benchmarks," the precise amount of punitive damages "must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff. In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Campbell, 538 U.S. at 425-26 (emphasis added). See also Gore, 517 U.S. at 582-83 (rejecting " 'a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case' " but reiterating " 'that [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus' " (quoting Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) ); Pensacola Motor Sales, Inc. v. Daphne Auto., LLC, 155 So.3d 930, 946-47 (Ala. 2013) (quoting Gore for the principle "that exemplary damages must bear a 'reasonable relationship' to compensatory damages").
The ARG defendants correctly note that the trial court "did not explain how the jury could justifiably award the same amount of punitive damages ($1 million) to each Wood Dealer," given the range of compensatory damages awarded.[16] The wood dealers' respective compensatory damages awarded by the jury varied widely, ranging from a low of $36,499.19 for THE Timber Company to a high of $343,634.87 for Dry Creek, yielding a range of punitive-to-compensatory ratios from 27.4:1 for THE Timber Company *274 down to 2.91:1 for Dry Creek. Even after the trial court applied the statutory cap on punitive damages-which limits punitive damages to the higher of "three times the compensatory damages" or, in 2015, the fixed sum of $711,200-the ratio of punitive-to-compensatory damages varied from a low of 2.91:1 to a high of 19.49:1. Specifically, the statutorily capped punitive-damages awards were as follows:
Plaintiff Compensatory Capped Punitive Ratio Ayres: $76,876.17 $711,200 9.25 BAR: $178,536.88 $711,200 3.98 Conecuh: $248,932.22 $746,796.66 3.00 Dry Creek: $343,634.87 $1,000,000 2.91 Pea River: $109,670.88 $711,200 6.48 Pineville: $98,542.50 $711,200 7.22 TTC: $36,499.19 $711,200 19.49
Nothing in the record supports the wide range of punitive-to-compensatory ratios. In fact, when we consider the defendants' conduct that supports the punitive damages we see that the wrongdoing toward each wood dealer was generally the same. Although some wood dealers brought more BCAP wood to ARG's mills than others, resulting in higher economic damage, there was no material deviation in the facts and circumstances of the ARG defendants' misrepresentations toward the wood dealers. Therefore, the jury's award of a uniform $1,000,000 in punitive damages to every wood dealer appears to be arbitrary and not based upon any relationship to the compensatory damages.
In determining what the reasonable and proportionate ratio in this case ought to be, we note that the wood dealer who was awarded the highest compensatory damages, Dry Creek, was awarded the lowest damages ratio, even after application of the damages cap, of just under 3:1. The Gore and Campbell opinions addressed in general terms circumstances where a low or a high damages ratio "may comport with due process,"[17] but that language did not address the situation when both low and high ratios are awarded to similarly situated plaintiffs in the same case. Even in a case with multiple plaintiffs, the touchstone of the second Gore guidepost continues to be a reasonable and proportionate relationship between the punitive damages and the amount of harm directed to each plaintiff.[18] To maintain that reasonableness here, therefore, those wood dealers who suffered less economic harm than Dry Creek may not be awarded *275 a proportionately (and for some, drastically) higher punitive-damages award than Dry Creek was awarded. A uniform, mathematical bright-line has been rejected for every case, but for multiple plaintiffs in the same case that have not shown substantially different tortious harm done them by the defendants, the arithmetic for punitive damages should be internally consistent, at least.
Beyond the internal logic of the 3:1 ratio that arises from a reasonable and proportionate application of Dry Creek's damages ratio to those of the other wood dealers, we have described the 3:1 proportion as "a ratio for which substantial support can be found under Alabama law." Sockwell, 829 So.2d at 137. See also Shiv-Ram, Inc. v. McCaleb, 892 So.2d 299, 317 (Ala. 2003) (holding that, under Gore and Campbell, a damages ratio of "slightly less than three to one" was not unreasonable). This Court has even referred to the 3:1 ratio as a "benchmark ratio discussed with approval in special writings of the Justices of this Court in various cases." Southern Pine Elec. Coop. v. Burch 878 So.2d 1120, 1128 (Ala. 2003). See also Target Media, 177 So.3d at 883 (on return to remand) (affirming judgment in the "thorough and well reasoned" trial-court order applying the 3:1 ratio as a "benchmark"). Additionally, 3:1 was adopted by the legislature in § 6-11-21, Ala. Code 1975, as the maximum ratio for punitive-to-compensatory damages in cases such as the present one (and where the fixed-sum does not apply). Thus, the approximate 3:1 ratio awarded to Dry Creek aligns comfortably with the "benchmark" ratio that has been held to be reasonable in Alabama law and numerous decisions of this Court.
Although we continue to refuse to identify any bright-line numerical value that would judicially cap punitive damages for all cases, we conclude that in the present case the second Gore guidepost, informed by Campbell and Alabama law, favors a remittitur to a 3:1 ratio of the punitive damages awarded to the wood dealers whose awards are not less than this 3:1 ratio: namely, Ayres, BAR, Pea River, Pineville, and THE Timber Company. No remittitur is necessary, therefore, for Dry Creek and Conecuh, whose damages ratios stand at 2.91:1 and 3:1, respectively.
c. Gore Guidepost 3: Similar Criminal or Civil Penalties
The third Gore guidepost is the comparison between the punitive-damages award and the civil or criminal penalties authorized or imposed in comparable cases. Campbell, 538 U.S. at 428 ; Gore, 517 U.S. at 583. The ARG defendants argue only that the FSA did not impose any sanction against them, although they concede that a civil penalty of the entire BCAP subsidy may be assessed if a party engages in a "scheme or devise [sic]" to obtain from BCAP more than permitted. The ARG defendants settled with the FSA and so avoided any civil penalty. The settlement required, among other things, that the ARG defendants repay the improper BCAP subsidy "overpayments" back to the FSA and pay the FSA for BCAP subsidies not yet disbursed to wood dealers who had delivered wood eligible for a BCAP subsidy to ARG's mills. The ARG defendants cite no other statutes or penalties in comparable cases and do not argue how this guidepost suggests further remittitur. The third Gore guidepost, therefore, does not support additional remittitur.
We have repeatedly noted that the Hammond / Green Oil factors are " 'similar, and auxiliary in many respects, to the Gore guideposts.' " CNH America, 160 So.3d at 1211 (quoting Ross, 67 So.3d at 41 ). In their briefs before this Court, the ARG defendants cite no cases or other legal *276 authority and offer mostly conclusory statements regarding the Hammond / Green Oil factors and the facts of this case. We will briefly address those factors.
d. Green Oil : Reprehensibility
We thoroughly discussed the reprehensibility of the ARG defendants' conduct under the "more narrow [review] under Gore and because we have concluded that [their] conduct was reprehensible under Gore, we need not readdress reprehensibility in our Hammond/Green Oil analysis." Shiv-Ram, 892 So.2d at 318. The ARG defendants offer little new argument here, although they curiously note that "some 40 other wood dealers that participated in BCAP with ARG ... did not file suit." Just as courts do not permit " 'the use of punitive damages awards for the purpose of punishing a defendant for harming others,' " Guyoungtech, 156 So.3d at 385-86 (quoting Philip Morris USA, 549 U.S. at 354 ), neither do we consider helpful to this analysis what nonparties to this suit did not do or any speculative reasons for such nonparticipation. Again, we find that the ARG defendants' conduct here was reprehensible.
e. Green Oil : Relationship of Award to Likely or Actual Harm
We have already considered the ratio of the punitive-damages award to that of the compensatory damages and remitted the wood dealers' awards to a 3:1 ratio. The ARG defendants provide no additional arguments or reasons that this factor favors additional remittitur.
f. Green Oil : ARG Defendants' Profit from Misconduct
Concerning the profitability of the ARG defendants' wrongful conduct, we have said that " 'the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.' " Green Oil, 539 So.2d at 223 (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala. 1987) (Houston, J., concurring specially)). The ARG defendants allege that ARG realized only about $122,000 total from the wood dealers' participation in BCAP (and that Landegger did not personally profit), but they concede that this was the amount remaining "after ARG reimbursed the FSA for 'overpayments' the FSA made to Wood Dealers." The ARG defendants' exhibits demonstrate that, as late as June 2011, Landegger and ARG signed a settlement addendum with the USDA agreeing to pay to the USDA "$91,391.00, in addition to $193,000.00 already paid." The initial settlement agreement was in November 2010. Assuming ARG paid the amounts agreed to, the facts indicate that the ARG defendants still retained those funds until, at the earliest, late 2010 and the middle of 2011, respectively, and presumably benefited accordingly. See CNH America, 160 So.3d at 1215 (discounting defendant's argument that it did not profit from misconduct because "CNH had the use of those funds for some time and presumably benefited from them during that period"); Sockwell, 829 So.2d at 139 (discounting insurer's argument it did not profit from misconduct because it ultimately paid insured where insurer "had use of the policy proceeds from September 1998 until April 2000" and "benefitted financially from having possession of the policy proceeds through earnings, interest, or through some other form of financial benefit"). Thus, although the funds were eventually repaid by the ARG defendants, the ARG defendants still benefited from the use of those ill-gotten funds acquired as a result of their misconduct.
Additionally, the ARG defendants anticipated making in excess of $10 million through their manipulation of BCAP, although this estimate included profit made on wood dealers not parties to this suit and for a longer period of participation than *277 what actually occurred. But even an intended profit may be considered under this Green Oil factor. See Tanner v. Ebbole, 88 So.3d 856, 876-77 (Ala. Civ. App. 2011) (citing Exxon Shipping Co. v. Baker, 554 U.S. 471, 494, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) ) (stating that " '[a]ction taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure' (and quoting 4 Restatement (Second) of Torts § 908, Comment e, p. 466 (1977): ' "In determining the amount of punitive damages, ... the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer...." ')"). Evidence in the present case that the ARG defendants estimated their manipulation of BCAP to yield over $10 million in profit favors the punitive-damages award for their misconduct.
However, as the trial court noted, the ARG defendants ultimately failed to provide sufficient documents detailing their financial position, including their financial gain from BCAP and the wood dealers. Without the relevant financial documentation, ARG's claims of a low profit was and is difficult to verify. Thus, we find that this factor does not weigh in favor of a remittitur.
g. Green Oil : Defendants' Financial Position
The ARG defendants expressly waived reliance upon this factor in the trial court and, on appeal, concede that this factor weighs against remittitur.
h. Green Oil : Plaintiffs' Costs of Litigation
Under this factor, " '[a]ll the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.' " Green Oil, 539 So.2d at 223 (quoting Lavoie, 505 So.2d at 1062 (Houston, J., concurring specially)). The ARG defendants note that the wood dealers filed a motion to tax approximately $21,000 in costs to the ARG defendants. The record does not contain any other costs or expenses the wood dealers produced either at trial or during the Hammond/Green Oil hearing, nor have they alleged any in their brief to this Court. Although the trial court correctly noted that "this case was litigated over five years" and "produced over 50,000 pages of documents," the record supports itemized litigation costs of only approximately $21,000. Therefore, this factor weighs in favor of remittitur.
i. Green Oil : Other Mitigating Criminal or Civil Sanctions
The last two Green Oil factors advise mitigation of the punitive damages "[i]f criminal sanctions have been imposed on the defendant ... [or] [i]f there have been other civil actions against the same defendant, based on the same conduct." 539 So.2d at 223-24 (quoting Lavoie, 505 So.2d at 1062 (Houston, J., concurring specially)). As explained previously, neither criminal nor civil sanctions were imposed on the ARG defendants. Thus, these last two factors do not favor remittitur.
In summary, after considering the Gore guideposts and the Hammond / Green Oil factors, we conclude that the wood dealers' awards of punitive damages in this case should be remitted to an internally consistent 3:1 ratio for each wood dealer, with the exception of Dry Creek and Conecuh, whose awards are already within or at that ratio.
IV. Conclusion
We affirm the trial court's judgment as to liability and compensatory damages. We affirm the punitive damages awarded to Dry Creek Loggers, Inc., and to Conecuh *278 Timber, Inc. With respect to the punitive-damages awards of the remaining wood dealers, the judgment of the trial court is affirmed on the condition that those wood dealers file with this Court, within 21 days, a remittitur of the punitive-damages awards to a 3:1 ratio. The respective remittitur for said wood dealers should be as follows:
Plaintiff Compensatory Remitted Punitive Ayres: $76,876.17 $230,628.51 BAR: $178,536.88 $535,610.64 Pea River: $109,670.88 $329,012.64 Pineville: $98,542.50 $295,627.50 TTC: $36,499.19 $109,497.57
Should any wood dealer fail to timely file the respective remittitur, the judgment as to that wood dealer will be reversed and the cause remanded for a new trial. See Ross v. Rosen-Rager, 67 So.3d 29, 45 (Ala. 2010) (affirming in part on condition that plaintiffs file a remittitur of punitive damages); § 12-22-71, Ala. Code 1975 (authorizing appellate courts to affirm judgment conditioned upon remittitur).
AFFIRMED IN PART AND AFFIRMED CONDITIONALLY IN PART.
Main, Wise, and Bryan, JJ., concur.
Stuart, C.J., and Bolin, J., concur in part and concur in the result.
Shaw, J., concurs in the result.
Sellers, J., recuses himself.
BOLIN, Justice (concurring in part and concurring in the result).
I concur with the main opinion with the exception of Part III.F, concerning compensatory damages, as to which I concur in the result only.
Stuart, C.J., concurs.

Steve Harris, the president of an ARG affiliate involved in the operation of ARG's pulp mills, was also named as a defendant. The jury found in his favor, and he is not involved in this appeal. For that reason, we have not included him in the definition of the ARG defendants.

Two other plaintiffs were initially in the complaint (Johnson and Associates, LLC, and Webb-Taylor Timber, Inc.), but on March 18, 2014, the trial court dismissed their claims with prejudice and entered a final judgment against them for violating the trial court's order to respond to the ARG defendants' discovery requests. Three other plaintiffs-Pea River Timber Company, Inc., Pineville Timber Co., LLC, and THE Timber Company, LLC-were not named in the initial complaint but were added in the amended complaint filed April 18, 2011.

Pub. L. No. 110-246, §§ 9001, 9011 (2008).

Black liquor is a dark slurry of water, chemicals, and other materials removed from the wood as a by-product of the paper-making process. Black liquor is created when wood chips are heated under pressure with a chemical mixture known as "white liquor" in large vessels called digesters, the object of which is to separate other undesirable materials from the cellulose fibers in wood that make up raw wood pulp. Once these undesirable materials are separated from the wood pulp in the digester, they combine with the other materials used in the process to form black liquor. This black liquor is then sent to the recovery boiler, where it is heated to remove the water, and the materials extracted from the wood are burned to create heat and power for use in the pulp mill. During the burning process, the nonflammable chemicals in the initial white-liquor mixture are also separated and removed, becoming "green liquor." Green liquor is then treated with lime to become white liquor that can subsequently be used again in the digester when the cycle is repeated. Pulp mills create their own black liquor as part of the paper-making process; some pulp mills also purchase additional black liquor from other sources to help meet their energy needs.

At the time of the transactions underlying this dispute, those two pulp mills were operated by two separate Landegger-controlled companies-Alabama River Pulp Company, Inc. ("ARP"), and Alabama Pine Pulp Company, Inc. ("APP"). In July 2010, both pulp mills were sold to Georgia-Pacific Corporation and ARP and APP thereafter merged and became ARG. ARP and APP were the initial defendants named in the wood dealers' complaint; however, ARG was substituted shortly before the trial began. For convenience, we refer to ARG as the owner of the two pulp mills.

Landegger was convicted of a failure to report a foreign bank account to the Internal Revenue Service, a violation of 31 U.S.C. § 5314.

Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986) ; Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989).

By contrast, all six of the other counts in the wood dealers' amended complaint allege claims against the "Defendants" generally, never specifying individual defendants as does count four.

In the third case in the string-cite by the ARG defendants on the continuance issue-a 1975 case from the Supreme Court of Colorado-the plaintiff in a false-imprisonment and slander case moved through counsel for a two-month continuance, his first, two days before trial because he was incarcerated in Mexico and therefore was unable to attend trial. Gonzales v. Harris, 189 Colo. 518, 520, 542 P.2d 842, 843 (1975). The trial court denied the continuance, but the Supreme Court of Colorado ultimately reversed its judgment and remanded for a new trial, citing Colorado cases holding "that the denial of a motion for a continuance because of the unavoidable absence of a party during litigation is grounds for the granting of a new trial." 189 Colo. at 520, 542 P.2d at 843. The Gonzales court relied on a 1929 Colorado case holding that " '[a] litigant has the right to be present to assist his counsel in the trial, and his necessary absence is a good reason for a continuance.' " 189 Colo. at 520, 542 P.2d at 843-44 (quoting Rausch v. Cozian, 86 Colo. 389, 390, 282 P. 251, 252 (1929) ). The Gonzales court also held that, "[u]nless there are no viable alternatives, 'appearance' by deposition is a wholly inadequate manner for the presentation of a party's case." 189 Colo. at 521, 542 P.2d at 844. We note that the basis for the Gonzales decision runs counter to the principles found in Alabama cases, including those cited by the ARG defendants in their brief. Moreover, the Colorado Supreme Court has distinguished Gonzales as a case involving a party "whose absence[ ] from trial [was] sudden and unexpected," as opposed to a situation where "all parties knew, to a virtual certainty, that [a party] would be unable to attend trial in Colorado." Cherry Creek Sch. Dist. No. 5 v. Voelker by Voelker, 859 P.2d 805, 809 (Colo. 1993). Even if we found Gonzales helpful to our analysis, which we do not, the instant case did not feature a movant whose absence from trial was "sudden and unexpected."

As part of their arguments that the trial court's rulings rendered the trial unfair, the ARG defendants also argue that the court erred in failing to grant their motions to compel their discovery requests, in failing to enforce the court's scheduling order, and in allowing the wood dealers "to introduce evidence identified at the 11th hour." The ARG defendants cite no authority for these arguments, however, so we consider them to be effectively waived. See Rule 28(a)(10), Ala. R. App. P.; Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala. 2007) (holding that Rule 28(a)(10), Ala. R. App. P., "requires that arguments in an appellant's brief contain 'citations to the cases, statutes, other authorities, and parts of the record relied on' " and " 'that a failure to comply with the requirements of Rule 28(a)(10) requiring citation of authority in support of the arguments presented provides this Court with a basis for disregarding those arguments' " (quoting State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 822 (Ala. 2005) )).

In their arguments against the allegedly excessive $682,349.94 in compensatory damages, the ARG defendants specifically argue that the compensatory damages of plaintiffs Ayres, BAR, Conecuh, Dry Creek, and Pea River should be reduced and provide extensive record citations, but they make no such arguments or record citations regarding the damages awarded to Pineville and THE Timber Company. We therefore consider the ARG defendants' challenge to compensatory damages for Pineville and for THE Timber Company to be waived as to this issue.

According to our calculations, if $96,813 is subtracted from $1,092,692.71 (the jury award of compensatory damages), the resulting amount is $995,879.71, from which is subtracted $313,528.82 (the proved compensatory damages). The resulting amount of alleged overpayment is $682,350.89, not $682,349.94.

In Hunt Petroleum, the majority opinion reversed the trial court's judgment on the basis of liability and so never reached the punitive-damages award, but Justice Houston in his special concurrence quoted the clear-and-convincing-evidence standard of § 6-11-20 and expounded on his view of the statutory standard as follows:
"The phrase 'when weighed against evidence in opposition' is very important. Unlike the typical review of a judgment based on a jury verdict where we must, as the jury may, disregard evidence submitted by the defendant when that evidence is disputed, when evaluating the propriety of punitive damages under Ala. Code 1975, § 6-11-20, we are required to weigh the conflicting evidence."
901 So.2d at 18. The position advanced in Justice Houston's special writing in Hunt Petroleum has never been ratified by this Court, and the ARG defendants make no claim that it has been.

As to the qualifying phrase in § 6-11-20(b)(1) that the fraud must be "gross, oppressive, or malicious," we have held the meaning of the latter words to be subsumed within the former word:
"The terms 'malicious' and 'oppressive,' as defined [in § 6-11-20(b)(2) & (5), respectively], and the term 'gross,' which is defined as inexcusable, flagrant, or shameful, see Talent Tree Personnel Services, Inc. v. Fleenor, 703 So.2d 917 (Ala. 1997), are subsumed within the definition of fraud in § 6-11-20(b)(1). In other words, it cannot seriously be argued that an intentional act of fraud committed for the purpose of 'depriving a person or entity of property or legal rights or otherwise causing injury,' is not a gross, malicious, or oppressive act, as those terms are defined in § 6-11-20. In short, for purposes of applying § 6-11-20(b)(1), the terms 'gross,' 'malicious,' and 'oppressive' are redundant."
Prudential Ballard Realty Co. v. Weatherly, 792 So.2d 1045, 1049 (Ala. 2000) (emphasis added).

Section 6-11-21(a), Ala. Code 1975, limits punitive-damage awards in cases such as this one to "three times the compensatory damages ... or five hundred thousand dollars ($500,000), whichever is greater." According to subsection (f) thereof, the $500,000 fixed-sum cap "shall be adjusted as of January 1, 2003, and as of January 1 at three-year intervals thereafter, at an annual rate in accordance with the Consumer Price Index [CPI] rate." The ARG defendants' motion to reduce the punitive damages according to § 6-11-21, using the 2015 January CPI adjustment, calculated the fixed-sum cap to be $711,200.

The ARG defendants argue that the ratios between the punitive damages and compensatory damages awarded were "unreasonable" and "excessive" and, citing Campbell, that they should be remitted to 1:1; they make no arguments, however, as to the disparate ratios among the wood dealers. The wood dealers do not address the second guidepost of Gore at all.

"[R]atios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' [Gore, 517 U.S. at 582 ; see also ibid. (positing that a higher ratio might be necessary where 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine'). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."
Campbell, 538 U.S. at 425.

In general, it would be inappropriate for a court to base the amount of punitive damages awarded to one plaintiff upon harm done to other similarly situated plaintiffs in the same case. " '[W]e can find no authority supporting the use of punitive damages awards for the purpose of punishing a defendant for harming others.' " Guyoungtech USA, Inc. v. Dees, 156 So.3d 374, 385 (Ala. 2014) (plurality opinion) (quoting Philip Morris USA v. Williams, 549 U.S. 346, 354, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) ).